In re WIMMER'S ESTATE.
WIMMER v. BAMBERGER R. CO. et al.

No. 7025. Decided June 27, 1947. (182 P. 2d 119.)

446

See 29 C. J. S. Electricity, Sec. 43.

*Skeen, Thurman & Worsley,* of Salt Lake City, for appellants.

*Moyle, McKay, Burton & White,* of Salt Lake City, for respondent.

LATIMER, Justice.

Plaintiff, as administratrix of the estate of her deceased husband, commenced an action against the defendants for the wrongful death of Willis Mark Wimmer. The suit was tried to a jury in the District Court of Salt Lake County, Utah, and the plaintiff obtained a substantial verdict. From the judgment entered on the verdict the defendants have appealed to this court.

The facts of the case necessary to dispose of the appeal are these. The plaintiff's husband, Willis Mark Wimmer, was at the time of his death employed as a carpenter for the Kimball Sign Company which was engaged as an independent contractor in installing Celotex insulation upon the walls and ceiling of several of the Bamberger Railroad's shop buildings at North Salt Lake, Utah. The accident causing Wimmer's death occurred in the paint shop, which

was a building 38'6" in width and 80 feet in length and designed to accommodate two of defendant's interurban electrically-operated trolley cars. The work of installing Celotex in this particular shop was commenced in January, 1946, and had been in progress five days when the deceased was electrocuted.

The car involved in the accident was standing inside and on the west rail of the paint shop when the Kimball Sign Company employees, including the deceased, started their work. During the five days preceding the accident the deceased and his fellow-worker, Hathaway, had been working to the side of, around, and above the car. In putting the insulation on the upper portion of the wall and the lower part of the ceiling or roof, they stood upon a scaffold which they themselves had constructed for that purpose. When installing the insulation on the upper part of the building, they made use of the rafters or stringers overhead; that is, they placed boards across these stringers and stood on the boards. At times they were directly over the car. Pieces of the Celotex were large and awkward to handle, and the workmen had dropped their tools either to the floor or onto the top of the car.

About 9:00 a. m. of January 18, 1946, the day of the accident, the deceased and Hathaway were working directly above the car handling a piece of Celotex when deceased's hat was knocked off his head and fell to the top of the car. The deceased continued with his work and made no attempt at that time to retrieve his hat. Later in the day and a few minutes before quitting time, which was 4:30 p. m., the deceased came down off the scaffold which was then located at the northwest end of the building, and proceeded to the south end of the car. In attempting to get on top of the car, the deceased grasped with his right hand the trolley pole which was in a horizontal position and extended over the south end of the car. The pole was energized with electricity and deceased was electrocuted.

During the five days preceding the accident while deceased was in the shop electric current was not connected

with the car, nor were the trolley poles energized by electricity until a few minutes before the accident itself occured. The reason for the power being put into the car at that time was that Erik Eriksson, an employee of the Bamberger Railroad and a co-defendant in this suit, had started working on the air system inside the car, and needed more light. He went outside the south end of the shop, and by means of the pole provided for that purpose, attached to the energized trolley wire a bared hook connecting to the lead-in wire, thus completing the circuit with the car. There were no trolley wires inside the shop above either track and both trolley poles on this particular car were down in the horizontal position being held in place by hooks on top of the car.

The lead-in wire came from outside the building into the southwest corner of the shop near the ceiling, and from there it hung loosely in an arc leading to the plug or receptacle located at the top and south end of the car. This wire had remained plugged-in to the receptacle all during the day of the accident and carried no energy until the hook was attached to the trolley wire outside the shop. Before completing the contact, Eriksson went to the Kimball Sign Company foreman who was present in the shop and asked him if it would be all right to complete the circuit. He received an affirmative answer. However, neither Eriksson nor the foreman gave notice to anyone else, including the deceased, that the connection was being made. Eriksson testified that he knew when he made the connection with the lead-in wire he turned into the car and also into the trolley poles an electric current of 750 volts, which was highly dangerous to human life. The evidence was further that this act of introducing power into the car inside the shop without first notifying personally everyone in the shop working on or in the vicinity of the car, including those other than Bamberger Railroad employees, was contrary to a safety practice which had been a custom at defendant's shops for over twenty years.

There were 40 ceiling receptacles in the interior of the car and each held a 56 watt globe. When the connection was made with the trolley wire these globes were illuminated.

Appellants assail the judgment under three general headings and charge that the court erred in the following particulars: (1) Denying defendants' request for a non-suit and directed verdict; (2) incorrectly instructing the jury; and (3) in ruling on the admissibility of certain evidence.

In disposing of these contentions our first concern is to determine the status of deceased with respect to appellants at the time he was injured. The parties have approached this problem from the standpoint of classifying the deceased as either a trespasser, licensee, or invitee. We elect to adopt the classification used in Restatement of the Law; that is, Trespasser, Licensee, or Business Visitor.

For the definitions used in this opinion see Restatement of the Law, Torts, Paragraphs 329, 330 and 332. A trespasser is defined as "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." A licensee is defined as "a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission." A business visitor is "a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with dealings between them." A workman who goes upon the land to make alterations or repairs is a business visitor.

A brief reference to the facts will disclose that the deceased when he attempted to retrieve his hat was either a trespasser or a business visitor. The controlling element in determining his status was whether or not under the facts of this case the deceased was invited or permitted to go upon the car *at the time* he met his death. If at the time and place he was not privileged to get on the car then he would be a trespasser.

The time element can be disposed of with little comment as the evidence is without dispute that the death occurred within the schedule of working hours maintained by the Sign Company and the defendants had either actual or constructive notice that the deceased had not finished his work for the day. If the deceased was privileged to get on the car he would not become a trespasser until the expiration of a reasonable time after completion of his day of work.

We are convinced upon the facts disclosed by the record that the deceased was a business visitor and permitted to get upon and use the car in connection with his work. In this connection the following facts are of significance: The deceased had been doing work for the benefit of the railroad company over and around the particular car. It was so located that the workmen were required to install insulation over the top of it. If, while working above the top of the car, tools or personal belongings were dropped by the workmen, they would fall onto the car, and because of the walkway and rather flat oval shape of the top of the car might remain there. The insulation being installed came in in large pieces of approximately 4 feet by 8 feet, and the sections were difficult to handle. The difficulty in working with the insulation increased the probability that the employees would drop items and it would make little, if any, difference to the rights of the employees to recover them, whether they were tools, wearing apparel, or pieces of insulation. There were no trolley wires inside the shop, and the trolley poles were hooked down under the trolley hooks, giving the car the innocent appearance of being entirely disconnected from the electrical current. The car was so spotted that it could be used in connection with hoisting materials to the ceiling and had been so used. The deceased and other employees had not been notified not to use the car, no notice was posted indicating the car might be unsafe for use, no warnings either oral or visual that the car was "out of bounds" for persons working in the shop and no information given deceased that the car

might be charged with electricity during the time he would be working in the shop.

A business visitor does not become a trespasser merely because his injury occurs while he is not at the very place he is working. He is entitled to use such other parts of the premises as are necessary or reasonably incidental to the work he is required to perform. The deceased was not only entitled to use the area where he was actually carrying on his work. He was also entitled, without losing his status as a business visitor, to use such other places on the premises as would have some reasonable connection with his work of installing the Celotex. Under the facts of this case there can be no doubt but that the deceased's excursion to the top of the car was reasonably connected with his work. The journey was not one related solely to his own comfort and necessity. It was closely inter-related with the proper performance of his work. It can reasonably and fairly be inferred that the purpose of going on top of the car was one that was mutually advantageous to both parties. An employee has, as an incident to his work, the right to wear certain protective clothing. It adds to his comfort and convenience and directly affects his capacity to work. Were we to assume that at the time of his injury deceased was in the act of getting his hammer, there would be little to support the contention that the excursion would not benefit the railroad company. Without it his work could not proceed with diligence. For all practical purposes there can be no difference in the status of deceased whether he was attempting to retrieve his hat or his tools, as in either event he was performing an act so closely connected with his work as to be a part of it and this work was of advantage to the railroad company. Such being the case we are compelled to hold the deceased was a business visitor. A contrary holding would restrict the activity of a workman on a third party's premises to such a degree that an immaterial departure from a strict routine would place him in the class of a trespasser.

In the law of negligence, it is generally stated that as to a business visitor ordinary care must be exercised by the owner of the property to see the business visitor be not injured. Restatement of the Law, Torts, Par. 343, states the rule:

"Toward the business visitor, the possessor owes the additional duty to exercise reasonable care to make the land safe for the reception of the visitor or at the least to ascertain the actual condition of the land so that by warning the visitor thereon, he may give the visitor an apportunity to decide intelligently whether or not to accept the invitation or permission."

Tested by these rules it can be said the railroad company failed in its duty toward the deceased. The company did not exercise ordinary care to see the deceased was not injured, it did not exercise ordinary care to make the premises safe, and it failed to warn the deceased of the peril concealed in what appeared to be a harmless trolley pole. We need not discuss the question of the defendant railroad company maintaining a dangerous instrumentality or trap as we have here a factual situation showing at least lack of due care. The deceased had been working in the premises for five days. The railroad company knew he would be working over the car. It knew the car was in the shop and that Celotex was being put on the ceiling. There had been no electricity in the car during the first four days. It had a practice of warning its own employees and other persons in the shop before the power was connected to the car, yet it failed to warn the deceased of any contemplated change, unless the fact that the lights inside the car and two lights in the outside of the car were illuminated, could be treated as a warning. No trolley wires were strung in the shop and the trolley poles were down. The employee of the railroad who turned the power into the car knew he was creating a dangerous condition, as he asked the foreman of the Sign Company if it would be all right to connect up the power with the car. The connection was made outside the building so that the deceased could not possibly see it being made. No new wires were strung

inside the building to give warning and no appropriate steps taken to notify deceased of the change in conditions. Not only did the railroad company fail in its duty to the deceased to keep the premises reasonably safe, it went further. It changed what had been a harmless instrumentality into one of the most deadly, thereby subjecting the deceased to an unreasonable risk without a reasonable opportunity on his part to discover the hidden danger. The evidence was sufficient to establish negligence on the part of defendants.

What has been said before substantially disposes of defendants' claim that the deceased was guilty of contributory negligence. The jury found against the defendants on this issue. The defendants contend in this regard that when they connected the power to the car, the lights on the inside of the car and the tail lights on the rear were illuminated, and that had the deceased acted as a reasonably prudent man and observed what he should have seen, he would have known the trolley poles were dangerous. In making this contention, defendants overlook certain significant facts that the jury was entitled to consider. As to the tail lights on the outside of the car, the defendant Eriksson testified that it was hardly dark enough to see those lights burning. Besides, the two tail lights referred to are small and located at the extreme top and end of the car. The lights on the inside of the car were ceiling lights and because of the fact that it was still daylight inside the shop, these lights would not be particularly noticeable to the men working in the shop. The record indicates that other witnesses who appeared at the scene immediately after the accident were uncertain as to whether or not the lights inside the car were burning. Even if we were to assume the deceased saw the lights burning, his negligence would still have been question for the jury. It must be remembered that the trolley poles were in a horizontal position and hooked down in place. There were no overhead wires and the presence of burning lights does not necessarily indicate to someone who is unschooled in the workings of a trolley car that the current was also flowing

into or through the trolley poles. An ordinary reasonable person might and probably would assume that the trolley poles were "dead" when not connected to the trolley wires.

The trolley poles even though charged with electricity gave no warning of danger. They appeared to be harmless. The force lurking therein was adequately described by the court in the case of *Mitchell* v. *Raleigh Electric Co.*, 129 N. C. 166, 39 S. E. 801, 802, 55 L. R. A. 398, 85 Am. St. Rep. 735:

"Electricity * * * is the most deadly and dangerous power recognized as a necessary agency in developing our civilization and promoting our comfort and business affairs. It differs from all other dangerous utilities. Its association is with the most inoffensive and harmless piece of mechanism—if wire can be classified as such—in common use. In adhering to the wire, it gives no warning or knowledge of its deadly presence. Vision cannot detect it. It is without color, motion or body. Latently, and without sound, it exists, and, being odorless, the only means of its discovery lies in the sense of feeling, communicated through the touch, which, as soon as done, becomes its victim."

It cannot be said that the deceased was negligent as a matter of law in touching the pole, when, as here, the pole gave no warning of being energized but on the contrary gave the impression of being disconnected from the source and had for a period of time been uncharged and harmless. We hold the trial court did not err in submitting this question to the jury.

Holding, as we do, that the deceased was a business visitor, disposes of assignments of error that the court erred in refusing to give certain of defendants' requested instructions. We deem it unnecessary to set them forth in haec verba. In substance the defendants requested ■ the court to instruct the jury that the deceased mounted the car solely for his own benefit, that he was not an invitee (business visitor), that he wrongfully took hold of the pole and that the defendants owed him no duty to keep the car and pole in a reasonably safe condition, and further, owed him no duty to warn him of the dangerous condition. All were properly refused.

Little need be said about defendants' contention that the court erred in the instructions as given. ■ Instruction No. 7, insofar as material, uses the following language:

"If you find from a preponderance of the evidence that the deceased *prior to his injury* was engaged in the performance of his work or things which were reasonably to be anticipated as part of and incidental to such work, then the defendant in the exercise of reasonable care had the duty to warn him, etc., * * *."

While as contended for by appellants the phrase "prior to his injury" made the instruction inaccurate, it was not prejudicial to defendants. Obviously the true test is not what the deceased was doing prior to his injury, but at the time of his injury. However, the evidence is sufficient to establish that both prior to his injury and at the time of his injury the deceased was doing something which was reasonably incidental to his work, and the defendants had a duty to warn him. Further, the court in Instruction No. 8 stated that the defendants were under no obligation to keep the car or its trolley safe or to warn the deceased unless

*"immediately prior to and at the time of his injury* his acts and conduct were such, that the defendants could have reasonably anticipated they were part of or incidental to his work * * *." (Italics ours.)

Appellants complain of Instruction No. 6 and assert it was vague and uncertain as to what work or activity is within the meaning of the language and is in- ■ definite as to time and place. The material part is quoted herewith:

"* * * and if you find from a preponderance of the evidence that in the exercise of such ordinary reasonable care the defendant corporation should have anticipated that said deceased in the performance of such work or things reasonably necessary as part of and incident to the furtherance of such work would come in close proximity to or in contact with said trolley pole and receive a dangerous current of electricity therefrom; then it was the duty of defendant corporation to keep said car and trolley pole in a reasonably safe condition and give warning of the danger of coming into contact with the trolley pole, and failure to do so would be negligence on its part." .

It was not necessary for the court to limit the instruction to the exact time of injury nor to define the exact purpose of deceased's excursion to the top of the car. While the evidence indicates the deceased went upon the car at the time he was injured to retrieve his hat, it further establishes that during the five days of work, he and Hathaway, his fellow worker, had climbed onto the car to recover tools they had dropped. In a situation such as was disclosed by this record, the duty of the railroad company was a continuing one, regardless of the reason prompting the deceased to mount the car. That is, it was the duty of the railroad company to maintain the car and pole in a safe condition during all the time it could reasonably anticipate the Sign Company workmen, as part of or incidental to their work, might be in the vicinity of the car. It was not relieved of the duty because the deceased was not working directly above the car just prior to his death or because he went after his hat. It would be indeed a strained construction to hold that the duty to keep the car in a safe condition was imposed upon the railroad company while the deceased was working over the car, but was not imposed while he was working to the side of it; and to keep it safe if he went after a tool, but not if he went after his hat.

Further, another duty resting on the railroad company was to warn the deceased that power *might*, at any time, be introduced into the car. This was a duty which commenced when the Sign Company employees came upon the premises to start their work. and continued until discharged by the railroad company's actually giving them warning. With or without this warning having been given, there was a further duty on the railroad company to notify the deceased before charging the pole with electricity. This latter duty was also imposed upon the company during all of the time it could reasonably anticipate the deceased would be working in proximity of the car. Had these appropriate warnings of danger been given, the deceased would then have been afforded the opportunity of knowing he was going upon premises fraught with danger, and could have

governed his actions accordingly. Finally, if the instruction is subject to the criticism that it is vague because it permits the jury to speculate as to whether or not retrieving of the hat was an incident to deceased's work it still was not erroneous, as we hold the act was so closely related to his work as to be part of it.

The last assignment of error necessary for this court to dispose of concerns the trial court's admitting into the record the following testimony of the witness, Dr. Plumb:

"Q. Doctor, I show you the plaintiff's Exhibit A which appears to have a cord running down from a light receptacle from the top of the car, is there a way by which the electric energy thus introduced into this car may have been prevented from going up into the trolley pole? A. Yes.

"Q. By what means could power be introduced for the purpose of lighting this car and still the power be prevented from going into the trolley pole? A. The current which is brought from outside of this building into the lights of the car could have very easily been disconnected from the trolley and from the other things that were connected to the trolley, like the controller, the motors, and so on, by a simple double switch which is connected to this source here; a double throw switch connected to the lighting in the car and by throwing that switch onto the trolley the car could be lighted directly from the trolley or from this, and the pole trollies would be dead; all the paraphernalia would be dead."

Appellants contend this evidence was inadmissible becouse not embraced within the acts of negligence alleged in plaintiff's complaint. One of the principal allegations and issues of negligence involved in this action was the duty imposed upon the railroad company. The evidence having established the deceased as a business visitor, the duty on the railroad company was to exercise ordinary care to see he was not injured. Any evidence which would help to establish that the railroad company could with little difficulty and expense have maintained the premises in a reasonably safe condition and yet failed to do so would be admissible.

458

Other errors such as failure to grant defendants' motion for non-suit and directed verdict have been considered. The court rightly overruled these. The judgment is affirmed. Respondent to recover her costs.

McDONOUGH, C. J., and PRATT, WADE, and WOLFE, JJ., concur.