**Janice MARCHELLO, for herself and as Administrator of the Estate of Keith Marchello, Deceased, Plaintiff-Appellant,**

v.

**The DENVER & RIO GRANDE WESTERN RAILROAD COMPANY, Defendant-Appellee.**

No. 76–2052.

United States Court of Appeals, Tenth Circuit.

Submitted March 15, 1978.

Decided April 14, 1978.

Rehearing Denied May 3, 1978.

Jackson B. Howard, of Howard, Lewis & Petersen, Provo, Utah (Robert C. Fillerup, of Howard, Lewis & Petersen, Provo, Utah, on the brief), for plaintiff-appellant.

Kenneth W. Yeates, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah (Gerald R. Miller, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, on the brief), for defendant-appellee.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The question in this wrongful death action in which the plaintiff's decedent was killed while working for his employer is whether the record discloses issues of fact which require that the case be tried or, if not, whether the plaintiff-appellant is entitled to recover as a matter of law.

We conclude that under the circumstances, it was error to grant the Railroad Company's motion for summary judgment. The cause should have been tried.

Based on deposition material and other file information, the trial court granted the motion for summary judgment on behalf of the Denver & Rio Grande Western Railroad Company and denied the motion for partial summary judgment filed by the plaintiff-appellant.

On June 24, 1975, Keith Marchello was killed near Castle Gate, Utah, when the loader which he was then operating fell from a bridge, causing the loader to fall upside down into the Price River below.

The complaint alleged that at the time of Marchello's death he was on Railroad property, a high bridge which spanned the mentioned river. He was being directed by an agent of the Railroad Company across a Railroad bridge which, at the particular places where the agent had told him to cross, the bridge was not sufficiently strong to hold the loader. It is further alleged that the agents of the Railroad directed that the front end loader be driven onto the bridge, notwithstanding that the bridge lacked the structural support to hold the weight of the loader at the particular place where he was directed by the Railroad to drive it. It was further alleged that the employees of the Railroad Company explicitly and implicitly represented to Marchello that the bridge was safe for such traffic when in fact it was not.

The events leading up to this tragic occurrence were these:

Marchello was employed by H–E Lowdermilk Company, a Colorado contractor. This company had been employed by Braztah Corporation, a Utah company, in conjunc-

tion with the McCullough Oil Company's expansion of coal mining activities. There was also a company called Geo-Mechanics which had been employed by Braztah Corporation to conduct certain drilling operations. In the process of this, a drilling rig which was being operated by the Geo-Mechanics personnel had to be moved across the Price River.

The several interested parties took part in the decision to ask the Railroad to use its right-of-way. Braztah notified Mr. Elbert Lowdermilk, decedent's employer, who in turn talked to an engineer from Braztah as to how the drilling operation was to be performed. These two parties concluded that the way to bring the drill to the area was to move it across the Railroad bridge to the site of the drilling. Following this meeting, Lowdermilk told his foreman, Crawford, that the drill needed to be moved into the area and that permission of the railroad should be obtained. A conversation was made with Mr. Zamantakis of the Railroad and he in turn talked to his supervisor, Kent Higham, who was the Train Master and most senior officer. Higham said that arrangements would be made for a flagman to be present during the move. He thereafter instructed Dave Blevins, a supervisor with the Railroad, to go to the site proposed for the move. Blevins did this. He met Crawford and Marchello and discussed the route of travel. The distance and the location of the drill site were explained to Blevins. It was decided that the move was to be made along the eastbound track (the south track) with the left wheels of the equipment between the rails of the track and its right wheels on the north side of the track. The four men, Blevins, Marchello, Crawford and Rittenhour, the drill operator for Geo-Mechanics, walked the entire distance of the proposed route and returned to the site, where Blevins had originally met the other three men.

Blevins secured a block from the Railroad, whereby no trains could proceed upon the tracks during the period of the block. This covered both the eastbound and westbound mainline.

The entire distance of the move was approximately one-half mile, and about midway it crossed the Price River over a bridge owned by the Railroad. The river and bridge intersect the railroad tracks at about a thirty degree angle, The surface of the road bed was a uniform layer of ballast. This created an appearance at track level which did not show where the bridge began and ended. However, as the bridge crossed over the river, there was a guard rail on each side. There were two mainline tracks spaced about 10 feet apart running east and west over the bridge. About 16 feet to the north of the northernmost mainline track, there was a side track. The width of the bridge was about 54 feet from north to south, and the length was approximately 60 feet.

The bridge is constructed with concrete abutments at both ends adjacent to the outer edges of the river. This provides support for three steel girders running the length of the bridge, one under each set of tracks. On the top of the girders are wood ties which support the track. Three-inch wood planking was placed by the men over the ties and also in the gaps between the tracks. The ballast was then placed over the planking so that the entire area appeared as one solid deck.

The loader which Marchello was operating was a Caterpillar Model 988 front end loader, which weighed 80,000 pounds. It had four very large tires.

On June 24, Marchello picked up the core drill with the loader bucket and proceeded across the bridge without incident. He proceeded along the route that had been decided upon by the four supervisors, that is, Blevins, Crawford, Marchello and Rittenhour. Later in the afternoon, Geo-Mechanics requested that the drill be moved once again. Again, the Railroad Company was contacted and again Blevins came to the site. He informed Crawford, Marchello and Rittenhour that a block (to stop train traffic) could not be obtained for the southbound track.

This necessitated moving the rig to the westbound track. Marchello swung the ve-

hicle to the left and positioned the wheels of the loader so that the left wheels were to the south of the south rail of the westbound tracks and the right wheels were between the rails of the westbound track. As the vehicle commenced to move along the westbound track, Mr. Blevins stopped it by motioning with his arms to Marchello and indicated to the latter than he wanted the left wheels between the track and the right (wheels) to the north of the westbound track. Marchello complied with this.

After the wheels were repositioned, the loader proceeded until it reached the bridge. As it moved onto the bridge, its right wheels crossed onto the unsupported three-inch planking which broke through under the weight of loader. The right wheels of the loader slid through the hole in the bridge and dumped the loader upside down into the Price River.

\*    \*    \*    \*    \*    \*

The position of the plaintiff was that the undisputed evidence established negligence as a matter of law since Blevins had directed Marchello onto an area of the bridge that was unsafe; a portion of the bridge which the Railroad knew or should have known to be unsafe; that this constituted active negligence sufficient to take the case out of the restrictions imposed by the licensee rule that the premises are to be accepted as the licensee finds them. The claim of plaintiff was that Blevins had failed to use reasonable care to ascertain whether the new area where the vehicle was directed was capable of supporting the 80,000 pound loader.

However, the trial court ruled against appellant, rejecting the contention that there was active negligence by the Railroad and holding instead that it was a mere preexisting condition unknown to the particular agent. The court continued that since it was a licensee relationship, all the Railroad had to do was warn of any dangers actually known by the particular agents; that there was no duty to inspect or otherwise insure that the premises would be safe for the intended use.

Reversal is sought on the ground that there was an authorized agent of the Railroad actively directing the routing of the movement and that it included changing the prior route which had proven safe and following an untried route that was unsafe.

Appellant also argues that the Railroad had a potential pecuniary interest and that had it had an opportunity to carry out discovery, it would have established this prior to the granting of summary judgment.

The focal question in the case is whether Marchello under the peculiar circumstances of the case was barred by the traditional intricacies of the licensee doctrine, which holds that a landowner owes no duty to a licensee to exercise reasonable care and caution to protect him from injuries which are the result of passive conditions outside the knowledge of the particular agent.

The first question is whether there is evidence which shows that Blevins was merely a flagman with no responsibility for the safety of the move. The trial court took this position that he was there merely to flag down trains that might be coming, for example. However, there is evidence in the record such as that which showed Blevins changing the route and positioning the wheels, which shows that he was much more than that; that he undertook to direct the movement.

Also, Belvins in his deposition said that he could have called the Bridge and Building Department of the Railroad to determine whether the proposed move was safe.

It is argued, in view of the fact that the situation was fraught with hazard brought about by the tremendous weight of the equipment and the fatal consequences which were threatened, that reasonable caution would have called for prior inquiry.

Mr. Kent Higham, the senior railroad supervisor, said in his deposition that he had delegated the responsibility to Blevins to take care of the actual movement and to see that it was done under circumstances satisfactory to the Railroad.

The cases in which the strict bare licensee rule comes into play show on their face the vast difference from our case. Prosser has documented these in enough detail to demonstrate this. *See* William L. Prosser, *Law of Torts* (4th ed.), p. 377:

> Among the more common classes of persons who enter with nothing more than consent are those taking short cuts across the property or making merely permissive use of crossings and ways or other parts of the premises; loafers, loiterers, and people who come in only to get out of the weather; those in search of their children, servants or other third persons; spectators and sightseers not in any way invited to come; those who enter for social visits or personal business dealings with employees of the possessor of the land; tourists visiting a plant at their own request; those who come to borrow tools or to pick up and remove refuse for their own benefit; salesmen canvassing at the door of private homes, and those soliciting money for charity; a stranger entering an office building to post a letter in a mail-box provided for the use of tenants only. The permission may of course be tacit, and may be manifested by the defendant's conduct, or by the condition of the land itself. It is often a question for the jury.

From Prosser's list it is to be inferred that the traditional restrictions of the licensee rule were formulated in connection with passive conditions on the land as applied to bare licensees, that is, persons who are on the land as a result of an implied or express permission to enter the land for a very restricted purpose and without landowner's participation. These cases do not have to do with the affirmative undertaking such as we have at bar.

Prosser discusses also activities which are dangerous to a licensee on page 379, and says:

> It is now generally held that as to any active operations which the occupier carries on, there is an obligation to exercise reasonable care for the protection of a licensee. He must run his train, operate his machinery, or back his truck with due regard for the possibility that the permission given may have been accepted and the licensee may be present.

Prosser also considers the obligation of the owner of land to disclose any *concealed* dangerous conditions of the premises of which he had knowledge. This is on the basis that by extending permission to enter he represents that the land is safe as it appears to be, and when he knows that it is not there is "something like fraud" in his failure to give warning. In the continued discussion it is said that the licensee is not to be expected to assume the risk of a defective bridge, an uninsulated wire, an unusually slippery floor or a dangerous step, in the face of a misleading silence. The author says that this viewpoint is accepted by the overwhelming weight of authority. *See* Prosser, *supra*, p. 389.

The trial court; Judge Anderson, took notice of the fact that the Supreme Court of Utah in earlier cases had cited § 342 of the Restatement of Torts with approval. *See Wood v. Wood*, 8 Utah 2d 279, 333 P.2d 630 (1959); *Tempest v. Richardson*, 5 Utah 2d 174, 299 P.2d 124 (1956).

In the case of *Schlueter v. Summit Cty., Town of Kamas*, 25 Utah 2d 257, 480 P.2d 140 (1971), the Supreme Court of Utah recognized that a landowner owes a duty to a licensee to refrain from allowing conditions to exist from which he can reasonably foresee injury. *See* 480 P.2d at 141.

In *Stevens v. Salt Lake Cty.*, 25 Utah 2d 168, 478 P.2d 496 (1970), the court said that a landlord "has a duty to exercise reasonable care to avoid injury to such licensees."

■ Section 342 of the Restatement of Torts provides that a possessor of land is liable to a licensee for a condition if he knows of the condition and realizes that it involves an unreasonable risk of harm to him. Section 342 of the Restatement *Second* makes the possessor liable if he knows *or has reason to know* of the condition and its danger is foreseeable.

In *Madison v. Deseret Livestock Co.*, 419 F.Supp. 914 (D.Utah 1976), *aff'd in part and*

*rev'd in part,* 574 F.2d 1027, No. 76–1797 (10th Cir., April 14, 1978), Judge Anderson, also the trial judge in this case, expressed doubt as to whether the Supreme Court of Utah would go along with the revised § 342, even though at an earlier time it had cited the original § 342 with approval. From the evidence presented we have to disagree. There is no reason for presuming that the Utah court would reject the revised § 342, especially since it has approved the previous version. *Schlueter, supra.,* adopts the "foreseeable danger" language of the revised § 342, rather than the "known danger" concept of the original. Also, in *Stevens v. Salt Lake Cty., supra,* 478 P.2d at 497, n.7, a comment to § 342 of the Second Restatement was cited by the Utah Supreme Court with approval. Thus from the evidence gleaned from the cases the presumption is opposite. It supports the assumption that the Supreme Court would update its conclusion by following § 342 of the Restatement Second.

Another panel of this court has taken the same view, reversing the *Madison* decision on this point. *Madison v. Deseret Livestock Co.,* 574 F.2d 1027, No. 76–1797 (10th Cir. April 14, 1978). In *Madison,* a hunter had been allowed to enter the land of the defendant for the purpose of hunting. A power line had sagged and severely injured plaintiff. Judge Anderson granted summary judgment for the defendant on the grounds that plaintiff was merely a licensee to whom defendant owed only a duty to warn of known dangers, and that there was no evidence that defendant or its agents knew of the sagging power line. Holding that the revised § 342, rather than the more limited original, should be applied, and that there were triable issues of fact whether the defendant knew or had reason to know of the condition, this court reversed.

This case, of course, is a stronger one for liability than is *Madison.* This is due to the evidence that defendant's agent undertook to guide and direct the decedent. Summary judgment would be even less appropriate here.

Plaintiff argues that the traditional rules limiting recovery on the part of licensees do not apply in this case due to the fact that Blevins undertook to direct Marchello onto the weaker area of the bridge. Considering the circumstances, that of the weight of the loader and the magnitude of the possible injury, a licensee should not be required to simply take the premises as he finds them.

■ We recognize that in order for a legal duty to exist, there must be something in the nature of the giving of assurance to the licensee as to the safety of the premises.

■ The Utah cases such as *Wood v. Wood,* 8 Utah 2d 279, 333 P.2d 630 (1959), hold that something more than a chance remark must be present in order to provide the assurance from the landowner or his agents that the premises are safe. In *Wood,* the court denied recovery to a licensee who fell down a stairwell while entering her son's house through the darkened garage. The court's view was that the daughter-in-law's statement that they might be in the den (meaning the persons in the house) if there were no lights on in front did not constitute an invitation to enter through the garage, and in *Tempest v. Richardson,* 299 P.2d 124 (Utah 1956), the plaintiff opened a door in a hall and stepped into an unlighted area and fell down a flight of stairs. He had been told that there was a light in the bathroom. The Utah court felt that the defendants had not done any act which could have actually contributed to the injury. From a reading of these cases, it would appear that the necessary undertaking was arguably present here. The actual guiding and directing of the vehicle from a safe passageway to an unsafe one constituted an active undertaking which gave rise to a duty to know whether the way was safe.

Cases from other jurisdictions illustrate what constitutes active conduct. Thus in *Mathias v. Denver Union Terminal Ry. Co.,* 137 Colo. 224, 323 P.2d 624 (1958), a reporter went to the defendant's depot to photograph some arriving visitors. To obtain a favorable angle he went to the second floor of the depot and, with the active assistance of defendant's employees, climbed out a window and onto a glass canopy, which

gave way beneath him. The Colorado court held that the plaintiff was a licensee when he went out the window, but when a licensee is apparently oblivious to a danger and acts with the assistance of the owner through his agents and no warning is given, he may maintain an action on the basis of active negligence.

See also Herold v. P. H. Mathews Paint House, 39 Cal.App. 489, 179 P. 414 (1919), wherein the plaintiffs' wife went to the building which housed his factory. An employee of the owner told another employee to take her up to the factory in the elevator. The elevator was in a dark area and was guarded by a gate which the employee opened for the purpose of pulling the cable to bring the car down to their level. Not realizing that the car was not there, the plaintiff's wife stepped into the shaft and was killed. The court ruled that a jury issue was present as to whether the actions of the employee constituted a representation to the wife that it was safe to enter the elevator, thus creating active negligence toward her.

In Hennessey v. Hennessey, 145 Conn. 211, 140 A.2d 473 (1958), defendant, who had reason to be aware of the presence of rain water on a waxed floor and who "induced" plaintiff to enter a room by asking her to shut the door, was held to have failed to exercise reasonable care to refrain from actively subjecting her to danger or to warn of the dangerous condition.

To the same effect are Neuman v. Fox West Coast Theatres, 194 P.2d 706 (Cal. App.1948), and Mistretta v. Alessi, 45 N.J. Super. 176, 131 A.2d 891 (1957).

A parallel body of law which is similar to that which has developed in landowner cases is the rule which pertains to the presence or absence of a duty to exercise care following a gratuitous undertaking. Restatement of Torts Second § 323 states in essence that one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things is subject to liability to the other for physical harm resulting from failure to exercise reasonable care to perform the undertaking, if his failure to exercise such care increases the risk of such harm, or the harm is suffered because of the other's reliance upon the undertaking. The essence of this doctrine is then that although there may not be an initial duty to act affirmatively for protection of another, if one gratuitously undertakes to act, he must carry out his undertaking with care.

In an early case the Supreme Court of Utah has recognized this principle in a dictum. The statement is found in Gitzhoffen v. Sisters of Holy Cross Hospital Ass'n, 32 Utah 46, 88 P. 691 (1907). There a hospital had received the plaintiff under a contract with the county. The nurses in the hospital were negligent, and it was held that the hospital was liable. The court said that there was a duty based upon the contract to exercise care. However, the court further said:

> But, if one receives another into his house for the purpose of treating him, and assumes and undertakes to do so, though it may be done gratuitously, there is some force to the position that he should be held liable for the negligence of his servant in the discharge of the duties undertaken and assumed by him, upon the principle of law that, if a person actually undertakes and enters upon the execution of a particular work, it is his duty to use reasonable care in the manner of executing it, whether done by himself or through his servants. Applying the principle, there is force to the argument that the defendant, having received the plaintiff into its hospital, and having assumed and undertaken to treat him, it thereby assumed the duty of using reasonable care in so doing.

88 P. at 695.

In our case also there was evidence of a positive undertaking which was relied upon by the decedent. This principle in the light of these facts also dispels the notion that since the plaintiff was a licensee, he accepted the premises as he found them and that no duty existed to exercise care in conducting him across the bridge.

The case at bar is different from that which the court had before it in Madison,

*supra.* The active participation of the Railroad in this movement back and forth makes the case a different one than that presented in *Madison.* In our judgment it is a case in which all of the evidence should be presented and a decision made in this light. The trial court is also directed to allow further discovery in the interest of having all available facts ascertained as to the relationship, the available knowledge and the scope of the undertaking.

The important fact questions which are to be submitted to the jury on remand are whether the defendant, in view of the surrounding facts and circumstances, had an obligation to ascertain whether it was safe and thus to know the facts pertaining thereto or, stated differently, whether it knew or *should* have known of the risk incident to moving the equipment along the particular area where support was lacking.

We conclude that the trial court erred in granting summary judgment to the Railroad. For that reason, the judgment of the district court must be reversed and the cause remanded for further proceedings consistent with the views expressed herein.