Gray F. MADISON, Sr., and Elizabeth B. Madison, husband and wife, Plaintiffs-Appellants,

v.

DESERET LIVESTOCK COMPANY, a Utah Corporation, Defendant-Appellee.

No. 76–1797.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 17, 1977.

Decided April 14, 1978.

Rehearing Denied May 8, 1978.

James P. Cunningham, Phoenix, Ariz. (Cunningham, Goodson & Tiffany, Ltd., Phoenix, Ariz., and Rawlings, Roberts & Black, Salt Lake City, Utah, on brief), for plaintiffs-appellants.

Raymond M. Berry, Salt Lake City, Utah (Harold G. Christensen, Scott Daniels of Worsely, Snow & Christensen, Salt Lake City, Utah, on brief), for defendant-appellee.

Before SETH, Chief Judge, HOLLOWAY and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is a diversity action for personal injuries to plaintiff Gray F. Madison resulting from severe electrical burns when he came in contact with a fallen power line during a hunting trip on a ranch owned by defendant Deseret Livestock Company (Deseret). Mrs. Madison joins as a plaintiff, seeking damages for loss of the care, consideration and society of her husband, and for her emotional distress caused by viewing the suffering and injuries of her husband. The trial court granted summary judgment against both plaintiffs, and they appeal.[1] In reviewing the summary judgments, we must consider the record in the light most favorable to the plaintiffs who resisted the motions, *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.,* 555 F.2d 778, 784 (10th Cir.), and so viewed, the summary judgment papers reveal the following facts.

Deseret owns the Skull Valley Ranch located approximately 40 miles from Salt Lake City, Utah. A state highway (also referred to as the Skull Valley Road) traverses most of the ranch property running from north to south. In 1960 Deseret constructed power lines to supply electricity to irrigation pumping stations on its ranch. Deseret owns the power line, poles and attendant electrical equipment which caused the injury to Mr. Madison. (VIII R. 63).

Rains fell in the area of the Skull Valley Ranch from October 29 through November 1, 1974. Plaintiffs submitted expert testimony that contamination had previously occurred to the insulation and weathered cross-arm of the second pole west of the Skull Valley Road supporting the line. The pole is clearly visible from the road. There was expert opinion that with the application of rain the contamination caused leakage of current and a fire commenced; the cross-arm of this pole burned through and fell during the rains; and the north and south energized lines sagged to within four or five feet from the ground and remained in this position until Mr. Madison came in contact with them. (Afft. Dr. Truet Thompson, IX R. 302–05).[2]

The two outside primary lines fell to a position where they sagged from the pole next to the west side of the highway approximately four or five feet from the ground for an overall distance of approximately 1000 feet. The burned pole, cross-arm and sagging wires could be seen from the highway. (See photographs, IX R. 291–92; afft. Russell Calame, IX R. 299–300; dep. Donald Taylor, VII R. 14, 19–20, 22, 35–36; afft. Dr. Thompson, IX R. 304–06).

---

1. The memorandum opinion granting summary judgment against the claim of Mr. Madison is reported at 419 F.Supp. 914. The opinion ruling against Mrs. Madison's claim is unreported.

2. Dr. Truet B. Thompson is a professor of engineering on the faculty at Arizona State University. Dr. Thompson has been engaged in teaching and practice of electrical engineering for almost 30 years. (IX R. 302).

The foreman of Deseret's ranch, Donald Taylor, stated in his deposition that on any given day he would travel up and down this highway under this power line an average of "probably five times, four or five times." (VII R. 34; see also afft. Donald Taylor, IX R. 442). However, Taylor also said that "on the morning of November 7, prior to the time the accident occurred, I drove between the south and north ranch and looked and did not observe any conductors on the Deseret Livestock line going to the west pump sagging at the point where the conductors crossed the highway approximately 500 feet east of where the accident occurred." (IX R. 442).

On November 7, 1974, plaintiff Gray F. Madison went to the Skull Valley Ranch at Deseret's invitation to hunt pheasants. The hunting party consisted of Ken Garff, David Freed, Daniel Freed (officers and directors of Deseret), Robert Garff (son of Ken Garff), Billy Freed (son of Daniel Freed), John Wallace (a friend of Ken Garff and Daniel Freed), and Madison. The hunting party started from the north ranch, divided into two groups, and generally worked south with the intention to re-group in the vicinity of the accident scene. Taylor stated that he knew the party was to be hunting that day, but said he did not know where they would be hunting (VII R. 14–16); the District Court concluded, however, that Taylor knew that the hunting party was going to hunt in the field where the line was located. (IX R. 466).

Madison testified that he has no recollection of seeing the fallen line before the accident. He was an experienced hunter and approached a wire fence encountered just before the accident and looked at it "well." The last thing Madison remembers is crawling under the fence and standing up. (Gray Madison dep., III R. 34–36); see also photograph of the thicket referred to by Madison, IX R. 293). None of the hunting party observed how Madison came in contact with the wire, but they did see him later with the wire across his chest. Madison received severe multiple electrical burns throughout his body, requiring some amputation and loss of function and use of extremities such as his hands and feet.

Mr. Madison brought suit for damages against Deseret for negligence in failing to maintain its ranch premises in a reasonably safe condition for visitors, in failing to give adequate warning of an inherently dangerous condition, and in having maintained a high voltage power line in a negligent manner. Mrs. Madison sought damages for her own pain and suffering in witnessing the pain and suffering of her husband, as well as for permanent denial of his care, consideration, society and conjugal relationship, and for the permanent alteration of her life from her previous marriage relationship.

The District Court granted summary judgment against Mrs. Madison, holding that the Utah Supreme Court has denied recovery for loss of care, consideration, society and normal pursuits of life—in short, consortium. Moreover the Court rejected her claim for suffering from witnessing her husband's pain and suffering.

The District Court likewise granted summary judgment against Mr. Madison, holding that he was a mere licensee and that Deseret would be liable only if it knew of the condition on the land from which risk of harm was reasonably foreseeable. The Court concluded that there was no genuine issue of material fact with respect to knowledge of the sagging wire by Deseret's employees prior to the accident, particularly in view of the denial of knowledge by the ranch foreman, Mr. Taylor. Furthermore, the Court rejected Mr. Madison's argument that Utah statutes for maintenance of electrical installations and the regulations, and safety codes incorporated by them, afforded him a right of recovery. The Court concluded that Madison had presented no specific facts demonstrating violation of the statute or the safety code. For these reasons, summary judgment against all of Mr. Madison's claims was granted.

We will detail the facts and the reasoning by the District Court further in discussing the appellate contentions.

### I

*Mrs. Madison's claims*

First, Mrs. Madison argues that the District Court erred in dismissing her claim for

injury which she suffered by reason of being within the environment of the trauma. She asserts that the injury to her by being compelled to witness the pain and suffering of her husband since the accident, the loss of the care, consideration and society of her husband, and the destruction of her marriage relationship are compensable under Utah law. Alternatively, she argues that Arizona law should be applied under which her recovery should be sustained!

We must disagree. As the District Court pointed out, the Utah Supreme Court has held that injuries in the nature of loss of support, companionship, love and affection resulting from injury to a spouse do not give rise to a right of recovery. *Ellis v. Hathaway,* 27 Utah 2d 143, 493 P.2d 985, 986. She has no right of recovery for loss of consortium under the common law. Ibid. Moreover, the District Court said that such a right of recovery does not arise independently of the injuries to the spouse, but is in the nature of an action "on account of personal injury or wrong" to the spouse, according to the Utah Court. The Married Women's Act, § 30–2–4, Utah Code Annotated (1953), placed the husband and wife on an equal basis by denying the husband a right of recovery on account of personal injury or wrong to his wife; it did not create a right of recovery in the wife for injury to her husband, according to the *Ellis* case. See 493 P.2d at 986.

Moreover, we must also sustain the ruling of the District Court against the claim for physical and emotional trauma resulting from the witnessing of the husband's suffering after the accident. The Court distinguished *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (Cal.), relied on by Mrs. Madison. There a cause of action was recognized for emotional distress suffered by a mother as a result of witnessing an accident resulting in the death of her child. The District Court concluded that there was no authority supporting recovery from merely witnessing the effects of injuries to the victim at a later date, and said that the Court could not

presume that such would be the law in Utah, were the Utah Court considering the case.

Mrs. Madison argues that recovery for injury to her marriage relationship and the elements alleged by her is supported by the Utah decisions of *In re Behm's Estate,* 117 Utah 151, 213 P.2d 657 and *Paul v. Kirkendall,* 123 Utah 2d 1, 261 P.2d 670, *inter alia.* The *Behm* case recognizes recovery for such elements, but on a wrongful death claim which is distinguishable under Utah law as a special statutory cause of action vested in the survivors. 213 P.2d at 660–61. The *Paul* case likewise does not strengthen Mrs. Madison's claim. There an award to a husband for loss of his wife's services was upheld. We note that a California decision was cited on this point and perhaps California law was being applied, though this is not clear. We do know that now Utah does not recognize such a claim of a husband. See *Ellis v. Hathaway,* supra, 493 P.2d at 986.

Lastly, Mrs. Madison says that she should be allowed to recover for the injuries she alleges under Arizona law. However, the accident occurred in Utah, and the conflict of laws rule there is to apply the *lex loci.* *Jackson v. Continental Bank & Trust Co.,* 443 F.2d 1344, 1349 (10th Cir.). Thus the District Court properly applied Utah law to the claims of both Mr. and Mrs. Madison.

We are persuaded that the views of the District Court on the Utah law with respect to Mrs. Madison's claim should be sustained. The denial of recovery for injury to the marriage relationship and the several injuries related to it is supported by the Utah decisions. As to the claim for Mrs. Madison's pain and suffering resulting from witnessing Mr. Madison's pain and suffering after the accident, the views of the resident District Judge on the unsettled law of his State are persuasive and ordinarily accepted. *Sade v. Northern Natural Gas Co.,* 483 F.2d 230, 234 (10th Cir.). We feel his views

on this point are not clearly in error and that they should be upheld.[3]

## II

### Mr. Madison's claims

#### a. The common law claim of negligence

Mr. Madison vigorously argues that the District Court erred in rejecting his claims of negligence by Deseret as a possessor of land. He says that it was wrong to hold that he was only a licensee and not an invitee. He contends further that the Court erred in ruling that there was no issue of fact as to Deseret's lack of knowledge of the fallen line, and that the Court also erred in not considering whether Deseret had reason to know about the fallen line as a basis for liability to a licensee.

The District Court said it was undisputed that Madison entered the ranch for social and recreational purposes, that he had no business relationship with defendant, and that he was a licensee. The Court held that the licensee understands that he must take his chances as to any defective conditions unknown to the occupier of land, and is entitled at most to a warning of dangers which are known; and that the permission given to come on the land carried with it no obligation to inspect the premises to discover conditions which are unknown to the possessor of land and no duty to give warning or protection against conditions which are known or should be obvious to the licensee. (419 F.Supp. 917–18).

Mr. Madison argues that he was present on the ranch by express invitation; that while he was not there for a business purpose, his presence was for the mutual purpose and advantage of the owner as well as of himself to participate in the hunt, with major stockholders and a majority of the board of directors of the company participating; and that hunting was a normal incident to the maintenance of the ranch. In addition to these contentions for treat-

ment as an invitee, Madison argues that Utah law now premises the duty of the landowner toward even a licensee on constructive knowledge as well as actual knowledge, in keeping with § 342 of the Restatement of Torts (Second). Further, Madison says that granting summary judgment on the basis of lack of Deseret's knowledge of the fallen line was error in view of all the evidence as to how long the line was down and the numerous occasions when the foreman, Taylor, passed the fallen line. (Appellant's brief, 20–21, 36–38).

First, we are convinced that the Utah decisions support the District Court's conclusion that Mr. Madison was a licensee. In *Stevens v. Salt Lake County,* 25 Utah 2d 168, 478 P.2d 496, 498, the Court stated:

In considering the duty of a landowner to persons coming on his property, it is appropriate to point out the distinction between what are termed "invitees" or "business visitors" as compared to those who are termed "licensees." In order to qualify as the former, one who goes upon the premises of another must do so at the invitation of the owner. This may be expressed, or it may be implied because it is done in connection with the owner's business, or some mutual business of advantage to the owner. With respect to such invitees, the landowner has a comparatively high degree of care to assure their safety. A licensee is one who goes on the land of another without any such invitation. But in order that he not be a mere trespasser, there must be permission from the landowner, or at least an implied permission, which may be inferred from the latter's knowingly allowing repeated use of his land without objection.

Under these principles, which other Utah cases apply, we cannot agree that the District Court erred in holding that Mr. Madison was a licensee. See, *e. g., Cannon v. Oviatt,* 520 P.2d 883, 886 (Utah); *Wood v.*

---

**3.** On this latter claim we have noted the denial of recovery for emotional distress in other circumstances in *Covert v. Kennecott Copper Corp.,* 23 Utah 2d 252, 461 P.2d 466, 468–69,

and feel that it indicates that the District Court's assessment here is not out of line with the Utah decisions.

*Wood,* supra, 333 P.2d at 631 (applying § 342 of the Restatement of Torts); *Hayward v. Downing,* 112 Utah 508, 189 P.2d 442, 444; In re Wimmer's Estate, 111 Utah 444, 182 P.2d 119, 121–22.

Mr. Madison relies on *Skerl v. Willow Creek Coal Co.,* 92 Utah 474, 69 P.2d 502, and the statement there that "[a]n invitee is a person who receives an invitation from another." Id. 69 P.2d at 505. The *Skerl* case does affirm recovery by one as an invitee although there was no business purpose or connection with the presence of the plaintiff in the mine where the injury occurred. The case does not, however, actually decide that the status of an invitee may exist under Utah law without a business purpose or connection; the Utah Court pointed out that the defendant could not complain of the charge being insufficient for lack of information as to licensees and trespassers because no instructions on such details were requested. The defendant accepted the plaintiff's theory of invitee. Id. 69 P.2d at 507. The matter went to the jury on a broad allegation that plaintiff and others were invited to visit the mine, the defendant alleging she was a trespasser. In view of the limited scope of the decision and the other Utah cases on the definition of invitees, we cannot agree that the *Skerl* case establishes error in the District Court's ruling that Madison was a licensee.

Second, Mr. Madison argues that even if he was properly classed as a licensee there nevertheless was error in holding that Deseret could be liable only if its employees had knowledge of the fallen line under the test of § 342 of the original Restatement of Torts. He argues for application of the rules of § 342 of the Restatement of Torts (Second) by which a possessor of land is liable to licensees for harm only if " . . . the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger . . . ."

The District Court applied the test as stated in § 342 of the original Restatement,

which premises liability to gratuitous licensees, among other things, on whether the possessor of land "knows of the condition and realizes that it involves an unreasonable risk. . . ." The Court pointed to *Wood v. Wood,* 8 Utah.2d 279, 333 P.2d 630, 631. There the duty to a licensee was described as being "limited to refraining from willful injuries and from permitting conditions to exist which might be considered as traps." The Utah Court also quoted § 342 of the original Restatement of Torts. See also *Tempest v. Richardson,* 5 Utah 2d 174, 299 P.2d 124, 125. The Court felt that the Utah Court has departed from the principles of § 342 of the original Restatement only on the point that a landowner may be held liable for permitting "conditions to exist from which he reasonably should foresee that injury might result." *Schlueter v. Summit County, Town of Kansas,* 25 Utah 2d 257, 480 P.2d 140, 141–42.

■ As is held in No. 76–2052, *Marchello v. Denver & Rio Grande Western Railroad Co.,* 576 F.2d 262 (10th Cir.), we agree that the principles of § 342 of the Restatement of Torts (Second) apply. The reasoning is spelled out in *Marchello* in detail, including several developments in the Utah decisions. First, in *Schlueter v. Summit County, Town of Kamas,* supra, 480 P.2d at 141–42, the Utah Court stated that the landlord fulfills his duty to a guest or licensee "when he refrains from willfully causing injuries to the guest or licensee or *from permitting conditions to exist from which he reasonably should foresee that injury might result.*" This broader statement on liability to guests or licensees with respect to foreseeability of injury is in accord with modification made in § 342 of the Restatement of Torts (Second). Further in *Stevens v. Salt Lake County,* supra, 478 P.2d at 497, n.7, the Utah Court quoted comment (f) to § 342 of the Restatement Torts (Second).

It is true that in judging how far a State will go in adopting new principles the resident District Judge's views are accepted unless we are convinced he is clearly wrong. *Parsons v. Amerada Hess Corp.,* 422 F.2d

610, 613–14 (10th Cir.). However, for the reasons given in *Marchello* and in view of the circumstances cited, we feel that application of the principles of § 342 of the Restatement of Torts (Second) is clearly indicated.

Therefore the test of whether Deseret's employees knew or had reason to know of the fallen line should have been applied.[4] That test should be applied in the trial which we feel necessary because of genuine issues of fact. We turn now to those issues of fact.

The District Court held that there was no genuine issue of fact on knowledge of the fallen line by Deseret's employees relying primarily on the affidavit of Deseret's foreman, Mr. Taylor, and circumstances which the Court felt support his statement that neither he nor other company employees knew of the sagging line (419 F.Supp. at 919–20):

> The uncontested affidavit of defendant's agent Don Taylor, the ranch foreman, states that he did not know of the sagging line prior to the accident. He states that he had not seen it nor had any other employee mentioned that they had seen the line down. Certain facts strongly support this testimony. The field where the transmission line was located had not been in use for some time and no livestock were present in the area. The pumps serviced by the line had not been used for a few months. According to power company personnel and plaintiff's expert, Dr. Thompson, the fire which burned the cross arm and caused the line to fall probably occurred during the last rainstorm prior to the accident. If their theory is correct, the line would have been down just a few days at the time plaintiff encountered it. The fact that the burned cross arm and pole were clearly visible from the highway leading from one part of the ranch to the other does

not lead to the inference that the cross arm and sagging wire were noticed. Such an inference is unfounded, particularly in view of the fact that they were just as visible to the hunting party from the road and even more so from the field where they were hunting, yet none of the hunting party noticed the condition of the line. Since the condition was plainly visible, plaintiff was just as likely to notice it and appreciate the risk of harm as any agent of defendant.

Thus the affidavit of the foreman, which the Court viewed as uncontested, is the foundation of the summary judgment. However, we must consider the record as a whole. While the conclusion drawn by the Court may be a reasonable inference, there are circumstances in the record which are troublesome.

First, there are photographs showing the view from the highway. Taylor said that after the accident he noted that the line was sagging from the *first* pole next to the highway and that the wire across the highway was lower than the others (Taylor dep., VII R. 18, 20). The two outside primary lines had fallen to a position where they sagged from the first pole next to the highway, approximately four or five feet from the ground, for an overall distance of approximately 1,000 feet. The second pole from the highway, which was burned, the cross-arm and sagging wires could be seen from the highway. (See photographs, IX R. 291–92; afft. Dr. Truett Thompson, IX R. 304–06; afft. Russell Calame, IX R. 299–300). In fact, the foreman, Mr. Taylor, stated that there was nothing growing to obstruct a driver's view of the second pole. (Dep. Donald Taylor, VII R. 36). The affidavit of Dr. Thompson, who visited the scene of the accident, states that the power line is more visible to the naked eye than it appears in the photograph (IX R. 303).

---

4. Section 12(1) of the Restatement of Torts (Second) defines the term "reason to know" as follows:

 (1) The words "reason to know" are used throughout the Restatement of this Subject to denote the fact that the actor has informa-

 tion from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

Moreover the foreman stated that he would drive up and down this highway on an average day "probably five times, four or five times." (Id. at 34). He said, however, that "on the morning of November 7, prior to the time the accident occurred, I drove between the South Ranch and the North Ranch and looked and did not observe any conductors on the Deseret Livestock line going to the west pump sagging at the point where the conductors crossed the highway approximately 500 feet east of where the accident occurred." (Afft. Donald Taylor, IX R. 442).

In addition to evidence of the visibility of the fallen power line to the foreman and other Deseret employees using the road, there was proof tending to show that the line was down several days before the accident, (see afft. of Dr. Thompson, IX R. 302–05), during which Taylor would travel the road several times daily.

Plaintiffs also submitted the affidavit of Mr. Calame, an investigator, in opposing summary judgment.[5] Taylor told Calame the sagging wire had not been discovered until after the accident. However, in response to a question whether the line had been down a few weeks, Taylor replied that "[i]t hadn't been down but a few days . . . ." (IX R. 299). The District Court rejected the possibility of an inference that Taylor had known of the condition before the accident, accepting Taylor's explanation in a subsequent affidavit that his remark merely reflected an understanding he had developed as a result of discussion with power company personnel about the cause of the fire on the cross-arm and when it probably occurred. (IX R. 440). Again, the inference the Court drew may have been reasonable, but that inference is not the only one that is possible.

Moreover, we have noted Madison's testimony that he did not see the fallen line before the accident and the photograph of the thicket referred to by him. We are satisfied that there is a genuine issue of fact as to whether, as a licensee, he would discover and realize the danger of the fallen line.

■■■ Viewing the record as a whole we are not convinced that the summary judgment against Mr. Madison was proper. There are conflicting inferences to be drawn from the affidavits and depositions. The court must examine all the instruments in the light most favorable to the party opposing the motion. *Frey v. Frankel,* 361 F.2d 437, 442 (10th Cir.). Affidavits are not a substitute for trial and summary judgment is not proper where an issue turns on credibility. *Eagle v. Louisiana Southern Life Ins. Co.,* 464 F.2d 607, 608 (10th Cir.). Summary judgment should not be granted where different inferences can be drawn from conflicting affidavits and depositions. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176.

■■■ The District Court said there was no proof by plaintiffs that Deseret's employees knew of the condition. Direct evidence by an outright admission was not produced. There was, however, the statement by the foreman, Taylor, that could be viewed as an admission of prior knowledge, given an interpretation favorable to the plaintiff. Moreover, inferences from circumstantial facts may frequently amount to full proof of a given theory, and may on occasion even be strong enough to overcome the effect of direct testimony to the contrary. *Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1164 (10th Cir.). Like other facts, the existence of knowledge may be proved by circumstantial evidence,[6] which was produced here in the form of proof of the visibility of the fallen lines and of the foreman's driving up and

---

**5.** Mr. Calame was formerly the F.B.I. Special Agent in charge of the Salt Lake City Division of the F.B.I.

**6.** Merrill on Notice, § 44, p. 36 and note 63; *e. g., Thompson v. Updegraff,* 208 Okl. 332, 255 P.2d 912, 914. And see *Corporation of the*

*President of the Church of Jesus Christ of Latter-Day Saints v. Jolley,* 24 Utah 2d 187, 467 P.2d 984, 985 (the finding not only of facts based on direct evidence but also those which may be established from the reasonable inferences that may be deducted therefrom). .,

down the highway and by the power lines, several times each day, for several days when the lines were apparently down. And most importantly, a summary judgment should not be based on the deposition or affidavit of an interested party, like Taylor, as to facts known only to him—a situation where demeanor evidence might serve as real evidence to persuade a trier of fact to reject his testimony. *National Aviation Underwriter's, Inc. v. Altus Flying Service, Inc.,* supra 555 F.2d at 784.

 Summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt. *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F.2d 33, 36 (10th Cir.). We cannot agree that such a showing was made here for summary disposition of the claims of Mr. Madison. While we agree with the District Court's ruling that under Utah law Mr. Madison was a licensee, we feel that genuine issues of fact remain as to whether Deseret's employees knew or had reason to know of the fallen power line and reasonably should have foreseen that injury might result to Mr. Madison as a licensee; whether they should have expected that he would not discover or realize the danger; and as to the alleged negligence of Deseret in dealing with the condition and whether any such negligence proximately caused the injury. Therefore the summary judgment must be vacated as to this claim and the case remanded for trial.

b. *The claim of violation of statutory duty as to installations of electrical conductors, fittings, devices and fixtures*

Mr. Madison argues that Deseret also violated a statutory duty owed to "persons and property" that all installations of electrical equipment—including electrical conductors, fittings, devices and fixtures—be reasonably safe, as imposed by Utah Laws 1971, Ch. 166, Sections 1 through 3, §§ 58–36–20 to 58–36–22, U.C.A. (1953). Madison says he is entitled to recover as a person injured by violation of this statutory duty, and the rules of the National Electrical Safety Code referred to by the statute.

The District Court rejected this claim on the grounds that § 58–36–20, *et seq.,* is part of the licensing act for electricians; that the Act means only that the equipment be safe for use in the service for which the installation or equipment was intended; that Mr. Madison was not "using" the installation in the use for which it was intended and he thus was not within the class protected by the Act; that the National Electrical Safety Code is not made the law of Utah. Further the Court found that Mr. Madison had come forward with no evidence of violation of the Code or the Act. 419 F.Supp. at 921–22.

The statute in question was enacted in 1971 and appears as Chapter 166, Utah Laws 1971, approved March 17, 1971, §§ 58–36–20 through 58–36–22.[7] The Act provides in pertinent part in Section 1, Chapter 166, Utah Laws 1971, § 58–36–20:

Section 1. Broad application of act on installation of "electrical equipment"—Exceptions.

The provisions of this act shall apply to all installations of electrical conductors, fittings, devices and fixtures, hereinafter referred to as "electrical equipment," on public and private buildings and premises with the following exceptions: . . . [8]

Section 2, Chapter 166, Utah Laws 1971, § 58–36–21, U.C.A. (1953), on electrical installations further provides in pertinent part:

7. Although arranged in Chapter 36, Utah Code Annotated (1953) with statutes dealing with "Electricians," the statute relied on by Madison was enacted as a separate act on "Minimum Standards For Electrical Installations," approved March 17, 1971. It apparently is a new Act, not one amending earlier statutes.

The statutes dealing with "Electricians Registration And License" have been adopted and amended by separate Acts before and after the adoption of the statute on minimum standards for electrical installations. See Chapter 139, Utah Laws 1971; Chapter 135, Utah Laws 1973; §§ 58–36–1 U.C.A. (1953) *et seq.*

8. The various exceptions deal with diverse subjects such as installations in mines, ships or railway cars, installations in buildings or on premises used by electric supply agencies. They are not applicable to this case and no argument is made under the exceptions.

Sections 2. Standards of safety for installations of electrical equipment.

(1) *All installations of electrical equipment shall be reasonably safe to persons and property* and in conformity with the applicable statutes of the state of Utah, and all applicable ordinances, orders, rules and regulations of any political subdivisions of the state of Utah which are not in conflict with this act.

As used in this act, *"reasonably safe to persons and property"* as applied to electrical installations and electrical equipment *means safe to use in the service for which the installation or equipment is intended without unnecessary hazard to life, limb or property.* (Emphasis added).

The District Court pointed out that the statute says that "reasonably safe to persons and property" means "safe to use in the service for which the installation or equipment is intended without unnecessary hazard to life, limb, or property." The Court felt that Mr. Madison was not using the electrical installation in the use for which it was intended and thus he was not within the protected class. 419 F.Supp. at 922. We are unable to agree with such a narrow reading of the statute.

The broad and inclusive terms of the Act afford protection to "persons and property." If interpreted to mean that an injured party is covered only if *he* is using the equipment actively, then no protection is afforded to him if an unsafe electrical installation or equipment is being operated by another party or a company, resulting in injury to him. This would clearly defeat the purpose of protection broadly granted against "unnecessary hazard to life, limb or property." The statute covers "electrical conductors", "devices" and "fixtures," and operation of an electrical transmission line would normally be conducted by the owner, as here by Deseret to supply electricity to its irrigation pumping station. This is clearly a "use in the service for which the installation or equipment is intended" and protection of others from harm by an owner's operation of an unsafe line seems plainly to be covered, and not excluded because

the injured party was not "using" the transmission line himself. Nor do we feel that the arrangements of the statute on minimum standards for electrical installations in the code sections on electricians justifies any narrow construction of the Act in view of its broad and clear terms designed to protect "persons and property." See note 7, supra.

Where statutory standards of care broadly protect the public, a violation of a standard may support recovery by the injured person on a claim of negligence. *E. g., Newton v. Oregon Short Line R. Co.,* 43 Utah 219, 134 P. 567, 569; *Smith v. Mine & Smelter Supply Co.,* 32 Utah 21, 88 P. 683, 686–87; and see *Christensen v. Lelis Automatic Transmission Service, Inc.,* 24 Utah 2d 165, 467 P.2d 605, 608. Such a negligence claim is clearly recognized where, as here, the standard is designed to protect "life, limb or property." See *Smith v. Mine & Smelter Supply Co.,* supra, 88 P. at 686–87. In *Muck v. Snohomish County Public Utility District No. 1,* 41 Wash.2d 81, 247 P.2d 233, recovery was affirmed for violation of a rule regulating the height of high-tension lines. The court rejected a contention that the rule protected only those working on houses, not others standing on the ground, stating (id. at 236):

The limitation which appellant seeks to place as to those for whose benefit the rule was adopted is without justification. Similar regulatory statutes are said to have been passed for the protection of the public. *Arnold v. Ohio Gas & Electric Co.,* 1928, 28 Ohio App. 434, 162 N.E. 765; *Tri-County Electric Cooperative v. Clair,* Tex.Civ.App.1949, 217 S.W.2d 681. As said by Cardozo, J., in *Martin v. Herzog,* 1920, 228 N.Y. 164, 171, 126 N.E. 814, 816:

'A statute designed for the protection of human life is not to be brushed aside as a form of words, its commands reduced to the level of cautions, and the duty to obey attenuated into an option to conform.'

Certainly such a regulation is for the benefit of those working on and around the houses over which the high voltage wires are maintained.

See also *Brigham v. Moon Lake Electric Association,* 24 Utah 2d 292, 470 P.2d 393, 395 (a high degree of duty rests on one transmitting electricity in high tension wires to see that no harm befalls a person rightfully in proximity thereto and not guilty of wrongdoing himself); *Skerl v. Willow Creek Coal Co.,* supra, 69 P.2d at 507 (concurring opinion) (mine safety statute was for the protection of anyone lawfully in the mine).

■ Mr. Madison was lawfully on the Deseret property. We are convinced that he was within the clear intent of the statute designed for protection of the public. If he can establish that there was a violation of the statute proximately causing his injury, he is entitled to recover under the principles cited. Thus we must disagree with the ruling that he was not within the protection of the statute.

The District Court also granted summary judgment against this claim on the basis that Mr. Madison had come forward with no evidence of violation of the Code or the Act. However, the affidavit of the electrical engineer, Dr. Thompson, stated that he had inspected the power line, reviewed the Act and the Code and photographs, and read depositions, weather reports, and interrogatory answers, among other things. From his investigation he formed an opinion that there were violations of the National Electrical Safety Code (1) by failure to maintain adequate clearance (15 feet) of a 7,200 volt electrical conductor above the ground which was accessible to pedestrians, as required by Rule 232; (2) by failure to comply with Rule 214A in that the electrical supply line was not so arranged as to provide clearance from the ground or other space generally accessible; (3) by there being no systematic inspection as required by Rule 213A2; and (4) by violation of Rule

263C requiring a cross-arm of sufficient strength to maintain and hold up the vertical load. (IX R. 303–306; Deseret's answer to interrogatory 45, VIII R. 65).

■ ·While not made mandatory, the National Electrical Safety Code is specifically referred to in § 58–36–21, U.C.A. (1953).[9] Both because of this express reference and authorities permitting proof of violation of industry rules as evidence of negligence,[10] we feel that the showing made was relevant as evidence of violation of the statutory standard and of negligence. Again we must consider the summary judgment papers in the light most favorable to the party opposing the motion. *Frey v. Frankel,* supra, 361 F.2d at 442. We cannot agree that no factual issues are raised as to the claim by Mr. Madison of alleged violation of the statutory duty by Deseret, considering all the depositions, the affidavits including the expert testimony, and all the circumstances before us.

■ Lastly, plaintiffs ask that we take judicial notice of a contract between Deseret and Utah Power & Light Company relating to Deseret's responsibilities in connection with the electrical installations. Explanations are made that it was not the plaintiffs' fault that the contract was not earlier known and brought into the case. These matters are not properly before us. In view of the disposition we are making, it will be available to Mr. Madison to ask leave to amend to plead these matters under Rule 15(a), F.R.Civ.P., see *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222, and the District Court may then consider such application on remand.

Accordingly, the summary judgment in favor of defendant Deseret and against Mrs. Madison is affirmed; the summary judgment against Mr. Madison is vacated

---

**9.** Section 58–36–21(2) provides that conformity with the Code or other designated codes shall be prima facie evidence that installations of electrical equipment are reasonably safe to persons and property.

**10.** See *Wallner v. Kitchens of Sara Lee, Inc.,* 419 F.2d 1028, 1032 (7th Cir.); *Spurr v. LaSalle Construction Co.,* 385 F.2d 322, 328 (7th Cir.);

*Boston and Maine R.R. v. Talbert,* 360 F.2d 286, 290 (1st Cir.); *Muncie Aviation Corp. v. Party Doll Fleet, Inc.,* 519 F.2d 1178, 1180–84 (5th Cir.); but see *Mississippi Power & Light Co. v. Whitescarver,* 68 F.2d 928, 930–31 (5th Cir.) (affirming exclusion of National Electric Safety Code).

and the case is remanded for further proceedings on his claims.