In re **SACRAMENTO MANSION, LTD., aka Sacramento Clarion or Clarion Sacramento, Debtor–In–Possession.**

**SACRAMENTO MANSION, LTD., aka Sacramento Clarion or Clarion Sacramento, Plaintiff,**

v.

**SACRAMENTO SAVINGS AND LOAN ASSOCIATION and Wells Fargo Realty Advisors Funding, Inc., Defendants,**

**Collin Equities, Inc., Intervening Defendant.**

**Bankruptcy No. 89 B 03875J. Adv. No. 89 C 0457.**

United States Bankruptcy Court, D. Colorado.

June 27, 1990.

---

594

A. Golodner, and J. Jones, of Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., for Sacramento Sav. and Loan Ass'n (Sacramento Sav.).

L. Kutner, of Rubner & Kutner, P.C., Denver, Colo., for Sacramento Mansion, Ltd., debtor-in-possession (debtor).

J. Lapin and E. Ramey, of Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, Colo., for intervenor Collin Equities, Inc. (Collin).

## MEMORANDUM OF DECISION DETERMINING NATURE, EXTENT AND PRIORITY OF LIENS

FRANCIS G. CONRAD, Bankruptcy Judge.*

Debtor, a Colorado limited partnership, commenced this adversary proceeding[1]

---

* Sitting by special designation.

1. We have jurisdiction to determine this adversary proceeding under 28 U.S.C. § 1334 and the general reference to this Court under General Procedural Order No. 1984–2. This is a core matter under 28 U.S.C. § 157(b)(2)(K). This Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. Rule 52 as made applicable by Rules of Practice and Procedure in Bankruptcy Rule 7052.

against Defendants to determine their respective interests in revenue at the Clarion Sacramento Hotel in California (Hotel).

We hold that revenue from Hotel room sales is personal property, rather than rent from real property, and when used as collateral for a loan, it is subject to the perfection and priority requirements under Article 9 of California's Uniform Commercial Code (UCC). We also hold that Hotel revenue from telephone services, convention services, meeting and banquet facilities, commissions, interest income, cash accounts earned, no-show revenue, guest laundry, valet, and in-room movies is personal property subject to the perfection and priority requirements of Article 9 of California's UCC.

Wells Fargo Realty Advisors Funding, Inc. (Wells Fargo) and its assignee Collin (Stipulation Exhibit # 12), have a perfected security interest in accounts, accounts receivable, and contract rights arising from or related to any business conducted on the Hotel's premises that encompasses the above mentioned sources of Hotel revenue. Accordingly, we hold Collin is entitled to summary judgment for its priority to Hotel revenue to the extent allowable under 11 U.S.C. § 552(b) and U.C.C. § 9306(4)(d).

Sacramento Operating, Inc. is Debtor's sublessee of Hotel's food and beverage sales. The food and beverage revenue is rental income under the terms of Debtor's sublease because Debtor executed an "absolute" assignment of rent to Wells Fargo which was perfected by Wells Fargo under California's real property law. Wells Fargo, in turn, assigned the assignment of rents to Collin. Accordingly, we also hold Collin is entitled to summary judgment on its request for priority on sums due Debtor from Sacramento Operating, Inc.

Debtor initiated this adversary proceeding to determine the nature, extent, and priority of liens or interests to Hotel revenue generated from room sales, cash, accounts, and accounts receivable. Debtor claims it owns the post-petition Hotel revenues free and clear of any lien. Each Defendant claims it has a first lien position on Hotel revenues.

Prior to trial, the parties vacated their request for trial, stipulated to material facts, and agreed this proceeding may be decided on the basis of their cross motions for summary judgment. A briefing period was set by the Court, after which, the matter was taken under advisement.

FACTS

The material facts in this proceeding are gathered from the parties' stipulation, representations, and exhibits. We pen only those facts necessary for our Decision.

On June 26, 1979, Sacramento Savings lent an original principal amount of $4,250,000 to W. Austin Cooper, Donald D. Rothchild, and Fort Sutter Company, a California corporation. The loan was evidenced by a "Deed of Trust Note" executed on the same day (Sacramento Savings Note). (Stipulation Exhibits # 1; # 2). The Sacramento Savings Note encumbered the Hotel and its real property. The "Deed of Trust Note" was recorded in the real property records of Sacramento County, California. An "Absolute and Specific Assignment of Rents and Profits" was also executed by the makers of the Sacramento Savings Note on June 26, 1979 and was recorded in the real property records of Sacramento County, California. (Stipulation Exhibit # 3). Pertinent terms of the "Absolute and Specific Assignment of Rents and Profits" include:

[o]wner ... hereby sells, assigns and transfers absolutely to Lender ... all issues and profits due, or to become due, crops, produce and rents of, on and from the said premises, and hereby transfers and sets over unto Lender, its successors and assigns, all leases, tenancies and contracts, oral and written, now or hereafter existing, in connection with said real property, the improvements now or hereafter placed or constructed thereon, and/or any existing or future leases, tenancies, royalties, and/or any other monies, income rents, issues or profits arising therefrom. Lender is hereby given full power and authority to operate ... said premises ... collect all of the rents,

issues and profits, and apply any sums realized as hereinafter set out. (Stipulation Exhibit # 3).

On or about April 1 1984, Debtor entered into a "lease"[2] with the Mansion Inn,[3] a California partnership, W. Austin Cooper, Donald D. Rothchild, and Fort Sutter Company, a California corporation (collectively Hotel owners). (Stipulation Exhibit # 14.) Hotel is managed for the Debtor by Associated Inns and Restaurants Company of America (AIRCOA) under a management agreement.

On April 5, 1984, Debtor entered into a $3,830,000 "Building Loan Agreement" with Wells Fargo. (Stipulation Exhibit # 4.) The funds were used by Debtor for the renovation of Hotel. Wells Fargo funded the "Building Loan Agreement" with three loans to Debtor: "Promissory Note Secured By Construction Deed of Trust" in the amount of $875,000, dated April 5, 1984 (Stipulation Exhibit # 5); "Promissory Note Secured By Construction Deed of Trust" in the amount of $2,625,000, dated April 5, 1984 (Stipulation Exhibit # 6); and, "Promissory Note Secured By Construction Deed of Trust" in the amount of $330,000, dated May 15, 1985 (Stipulation Exhibit # 7) (collectively "Wells Fargo Notes").

The "Wells Fargo Notes" are secured by an encumbrance on Hotel as evidenced by a "Construction Deed of Trust, Security Agreement and Assignment of Rents" (Wells Fargo Deed of Trust) executed by Debtor and Hotel owners, on April 5, 1984, for the benefit of Wells Fargo. (Stipulation Exhibit # 8). Debtor granted to Wells Fargo a security interest in Debtor's personal property. In particular:

(iii) All rents, issues and profits, and all inventory, accounts, accounts receivable, contract rights, general intangibles, chattel paper, instruments, documents, notes, drafts, letters of credit, insurance policies, insurance and condemnation awards and proceeds, trade names, trademarks and service marks, arising from or related to the Premises and any business conducted on the Premises. . . .; and, (iv) all replacements and substitutions for, or additions to, all products and proceeds of . . . any of the foregoing.

(Stipulation Exhibit # 8, at pages 10–11). The "Wells Fargo Deed of Trust" was recorded in the real property records of Sacramento County, California on April 13, 1984. (Stipulation Exhibit # 8).

The "Wells Fargo Notes" are also secured by an "Additional Advance and Consolidation Agreement" executed by Debtor and Hotel owners on May 15, 1985, and a "short form" version of the "Additional Advance and Consolidation Agreement" recorded in the real property records of Sacramento County, California on May 21, 1985. (Stipulation Exhibits # 9; # 10).

The April 5, 1984 financing statement executed by Debtor for Wells Fargo was filed with the California Secretary of State on April 26, 1984 and in the real property records of Sacramento County, California on April 13, 1984. (Stipulation Exhibit # 11). The description attached to the financing statement included:

All property owned or leased by [Debtor] affixed to or located upon the real property described in Exhibit 'A' attached hereto (the 'Premises'), including . . . and all personal property now or hereafter acquired by [Debtor], whether . . . related to or used in connection with the premises in which a security interest may be taken under the (UCC), including but not limited to: . . . (iii) all rents, issues and profits, and all inventory, accounts,

---

**2.** Although captioned "lease," neither Debtor nor Collin concede the agreement actually is a lease. Rather, they contend it is a "financing arrangement." The parties acknowledge that the issue of whether this transaction is a "true lease" or a "financing arrangement" may require a separate adversary proceeding where the fee owner, Mansion Inn, a California partnership, would be added as a defendant. For the limited purpose of this summary judgment proceeding, Debtor and Collin agree we may refer to this agreement as a "lease."

**3.** Mansion Inn, a California partnership, was not one of the original makers of the 1979 Sacramento Savings Note or Sacramento Savings Deed of Trust. The general partners of Mansion Inn are W. Austin Cooper, Donald D. Rothchild, and Fort Sutter Company.

accounts receivable, contract rights, general intangibles, chattel paper ... arising from or related to the Premises and any business conducted on the Premises; and (iv) all replacements and substitutions for, or additions to, all products and proceeds of ... the foregoing.

(Stipulation Exhibit # 11, "Schedule I;" parentheticals in original; brackets supplied).

On March 7, 1989, Wells Fargo executed an "Assignment" to Collin. (Stipulation Exhibit # 12). This "Assignment" conveyed to Collin all of Wells Fargo's right, title, interest, and estate to Hotel under the "Well Fargo Notes," "Well Fargo Deed of Trust," "Additional Advance and Consolidation Agreement," and "all other documents, instruments and security relating to the loan transactions evidenced by the [Wells Fargo] Notes." (Stipulation Exhibit # 12; brackets added). Under the "Wells Fargo Deed of Trust," Collin is a beneficiary of an assignment of rents from all leases with Debtor in the Hotel.

A. *Provisions Relating To The Trust Property*

.     .     .     .     .

A.7 *Assignment of Rents and Performance of Leases*

(a) As additional consideration for the indebtedness evidenced by the Note, Trustor hereby absolutely assigns and transfers to Beneficiary the following:

(1) All leases, written or oral, now in existence or hereafter arising for commercial areas in the Premises together with all the right, power and authority of Trustor to alter, modify or change the terms of such leases and agreements ...;

.     .     .     .     .

(3) The immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues and profits now due or which may become due or to which Trustor may now or shall hereafter ... become entitled or may demand ... arising or issuing from or any part thereof....

(b) Provided that there exists no default hereunder ... Trustor shall have the right under a license granted hereby and Beneficiary hereby grants to Trustor a license ... to collect ... all of the Rents ... but only as trustee for the benefit of the Beneficiary. Trustor shall apply the Rents so collected first to payment of any and all amounts due and payable under the Loan Documents. Thereafter, so long as no default exists hereunder ... Trustor may use the Rents in any manner not inconsistent with the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of a default hereunder....

(Stipulation Exhibit # 8, pages 9–10).

On May 12, 1989, Collin filed in Debtor's Chapter 11 case a "Notice of Perfection of Interest in Rents" under 11 U.S.C. § 546(b).[4]

Hotel generates income from overnight guest room sales, food and beverages, telephone, and other sources. (Stipulation Exhibit # 13). Other sources of Hotel revenue include convention services, meeting and banquet facilities, commissions, interest income, cash accounts earned, no-show revenue, guest laundry and valet, and, in-room movies.

Hotel operating revenue for the months of April, 1989 through October, 1989 from all of the above sources totals $3,290,697.[5] (Stipulation Exhibit # 13).

---

**4.** 11 U.S.C. § 546, *Limitation on avoiding powers,* provides in pertinent part:

(b) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for seizure or commencement.

**5.** For the Months of April, 1989 through October, 1989, the total Hotel revenue was $3,290,-697. $2,050,348 (room sales) + $901,653 (food

Debtor's share of the "food and beverages" income is controlled by a "Sublease" it has with sublessee Sacramento Operating, Inc., a California corporation. Pertinent rental terms include fixed yearly rental of $240,000 ($20,000 per month); 20% of all food revenues; 40% of all beverage revenues; and, other miscellaneous charges for taxes, etc. (Stipulation Exhibit #15).

As footnoted on the parties' Stipulation Exhibit #13, Debtor's share of the food and beverages must be backed out of the gross revenues under the food and beverage sales from Hotel operations for the months of April, 1989 through October, 1989. (Stipulation Exhibit #13). Debtor was entitled to receive approximately $420,-789.80 from Sacramento Operating, Inc., for the months of April, 1989 through October, 1989.[6]

Debtor's share from the total Hotel revenue for the months of April, 1989 through October, 1989 was $2,558,685.80.[7] Approximately 90% of Debtor's Hotel revenue is from the room sales and an additional 6% is attributable to Debtor's Sublease with Sac-

ramento Operating Inc., for the food and beverage concessions.

The parties stipulated that as of October 31, 1989, Debtor held $795,893.03 in Hotel revenue and income in its bank account.[8]

## CLAIMS OF THE PARTIES ·

The dispute of the parties centers on the legal characterization of Hotel room sales and Debtor's rental income from Debtor's sublessee's food and beverage operations.[9]

1. Hotel Room Sales.

Sacramento Savings compares Hotel room sales to compensation or income a landlord receives from a tenant. It argues the room sales constitute income from real property, over which a lien must be taken through an assignment of rents, issue or profits contained in a deed of trust or some other document capable of transferring real property interests. Sacramento contends California's UCC § 9104(j)[10] excepts the room sales from the perfection requirements of the UCC, and concludes a security interest in Hotel revenue is an interest in land which may only be perfected under

---

sales) + $251,148 (beverage sales) + $60,125 (telephone sales) + $27,423 (other sources).

**6.** Gross revenues from food sales for the months of April, 1989 through October, 1989 was $901,653, of which Debtor's 20% portion under the Sublease is approximately $180,-330.60. Gross revenues from beverage sales for the months of April through October, 1989 is $251,148, of which Debtor's 40% portion under the Sublease is approximately $100,459.20. Thus, Debtor's share of the food and beverages is $420,789.80, *i.e.*, $140,000 ($20,000 × 7 months) + $180,330.60 (20% of $901,653 from food) + $100,459.20 (40% of $251,148 from beverages). The $420,789.80 total does not include miscellaneous charges owed Debtor under the terms of the Sublease from Sacramento Operating, Inc. We were not informed of the amount due for miscellaneous charges, nor were we informed if the sublessee has paid its rent.

**7.** $2,558,685.80 = $3,290,697 (total revenues from April through October, 1989) − $1,152,801 (total food and beverages from April through October, 1989) + $420,789.80 (Debtor's share of food and beverages for April through October, 1989).

**8.** On November 1, 1989, Bankruptcy Judge Roland Brumbaugh entered an "Order Approving

Stipulation Regarding Payment of Retainer, Transfer of Venue, Assumption of Lease and Relief from Stay" which required Debtor to transfer from its bank account $391,152 to Sacramento Savings.

**9.** The legal characteristics of the other components of the Hotel revenue, *i.e.*, overnight guests for sales from rooms, telephone, convention services, meeting and banquet facilities, commissions, interest income, cash accounts earned, no-show revenue, guest laundry, valet, and, in-room movies, are undisputed and deemed personal property. Rental income from Debtor's sublessee for the food and beverage operation is treated separately *infra*.

**10.** Division 9, Cal.Comm.Code § 9104, *Transactions Excluded From Division*, provides in pertinent part:

This division does not apply

.    .    .    .    .

(j) Except to the extent that provision is made for fixtures in Section 9313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder and to any interest of a lessor and lessee in any such lease or rents; *Id.*

California's real property recording laws.[11]

Debtor and Collin say Hotel room sales are income from guests rather than tenants, and argue it is personal property on which a lien may only be had through a security agreement and perfected with a financing statement under applicable State UCC. Debtor and Collin agree that Collin is the only creditor with a security interest in Debtor's accounts, accounts receivable, and proceeds, and that security interest includes the room sales. Sacramento Savings concedes that if we determine the income from room sales is personal property, then it has no valid security interest in the room sales.

Debtor and Collin disagree on the post-petition effect of Collin's lien on the room sales' revenue.

Debtor argues § 552[12] cuts off the secured creditor's lien from reaching property acquired post-petition by Debtor or its bankruptcy estate. Debtor acknowledges § 552(b)'s exception to § 552(a)'s cut-off occurs when the pre-petition lien extends to "proceeds, products, offspring, rents or profits of such property," in which event the pre-petition security interest may continue post-petition to the extent permitted under applicable nonbankruptcy law. Under Cal.Comm.Code § 9306,[13] Debtor ar-

11. Division 2, *Property,* Part 4, *Acquisition of Property,* Title 4, *Transfer,* Chapter 4, *Recording Transfers [of Real Property],* Article 4, *Effect of Recording, Or The Want Thereof,* § 2113, *Record of Conveyances; constructive notice; recording certified copies; effect,* provides in pertinent part:

Every conveyance of real property or an estate for years therein acknowledged or proved and certified and recorded as prescribed by law from the time it is filed with the recorder for record is constructive notice of the contents thereof to subsequent purchasers and mortgagees....

Section 1214, *Prior recording of subsequent conveyances, mortgages, judgments,* provides in part:

Every conveyance of real property or an estate for years therein, other than a lease for a term not exceeding one year, is void as against any subsequent purchaser or mortgagee of the same property ... in good faith and for valuable consideration, whose conveyance is first duly recorded, and as against any judgment affecting the title, unless the conveyance shall have been duly recorded prior to the record of notice of action.

Section 1215, *Conveyance defined,* provides:

CONVEYANCE DEFINED. The term 'conveyance,' as used in Sections 1213 and 1214, embraces every instrument in writing by which any estate or interest in real property is created, alienate, mortgaged, or incumbered, or by which the title to any real property may be affected, except wills.

12. 11 U.S.C. § 552 *Postpetition effect of security interest,* provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security

agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, products, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

13. Cal.Comm.Code § 9306, *'Proceeds;' Secured Party's Rights on Disposition of Collateral,* provides in pertinent parts:

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in all of the following proceeds:

(a) In identifiable noncash proceeds and in a separate deposit account containing only proceeds;

(b) In identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings;

(d) In all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is both:

(i) Subject to any right of setoff;

(ii) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within 10 days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the

gues Collin's lien terminated upon the date of filing of Debtor's bankruptcy petition and:

> [t]o the extent Collins has a valid lien in proceeds, the proceeds lien would be limited to the amount of cash on hand as of the petition date. Collins cannot be entitled to an amount of money equal to the revenues collected by [Debtor] during the ten days pre-petition because much of this money was spent pre-petition on operating expenses. Since cash on hand as of the petition date has been commingled with cash generated post-petition, it is not possible to trace the proceeds and therefore Collin's lien in proceeds has been lost subsequent to the petition date.

Debtor's "Memorandum Brief in Support of Motion For Summary Judgment," page 12. We were not informed about the amount of Debtor's operating expenses directly attributable to Hotel room sales.

Debtor argues Collin is not entitled to invoke § 552(b)'s "equities" exception which qualifies the limited exception to § 552(a)'s prohibition of the continuation of pre-petition lien to post-petition proceeds. Debtor's premise is that § 552(b)'s "equities" exception requires that we make a finding that the modification of such limitations will assist Debtor in its reorganization efforts before we may overcome the limitation of applicable nonbankruptcy law and security agreements. Debtor says there are no facts to support an "equities" finding, thus, we may not excuse Collin from the limitation of its security agreement and applicable nonbankruptcy law under § 552(b).

For § 552(b) purposes, Collin advances California's § 9306(4)(d) entitles it to cash proceeds received by Debtor within 10 days before Debtor's date of petition, and to proceeds from accounts that arose during the 10–day pre-petition period and were acquired post-petition by Debtor. Lastly, Collin argues § 9306(4)(d)(ii) does not require tracing of commingled proceeds.

By way of rebuttal, Debtor says Collin ignores the fact that Debtor had incurred

and paid operating costs during the 10–day pre-petition period, and that "[a]t most, Collin should have a lien in cash in an amount not to exceed the cash on hand on the filing date." Debtor's "Reply Brief," page 5. Debtor advocates an application of the tracing doctrine to the proceeds of Debtor's pre-petition accounts receivable that were commingled by Debtor with non-cash collateral in various deposit accounts. Debtor concludes that to the extent the proceeds can not be traced, Collin's lien is lost. Lastly, Debtor argues § 9306(4)(d)(ii) limits the proceeds lien upon bankruptcy to cash proceeds "received" by the Debtor within ten days before the date of bankruptcy.

2. Food and Beverages.

Debtor's position on the food and beverage revenue is that it had been assigned to Collin as collateral.

Neither Collin nor Debtor dispute the real property status of the rental proceeds from Debtor's sublessee's food and beverage operations. Collin and Debtor agree the food and beverage income is rent. Collin and Debtor also agree that Collin had perfected its security interest in the rents in the appropriate land records. There was no similar assignment of rental income from Debtor to Sacramento Savings for the food and beverage operations. All parties agree the portion of Hotel revenue attributable to Debtor's Sublease of the food and beverage concessions with Sacramento Operating, Inc. is not subject to Article 9 of the California's UCC under § 9104(j). Debtor's "Memorandum Brief in Support of Motion for Summary Judgment," page 7; Collin's "Brief in Support of Motion for Summary Judgment," page 10–11; Sacramento Savings "Motion for Summary Judgment, and Brief in Support Thereof," page 13.

Sacramento Savings says we cannot decide the legal status of Debtor's income from the food and beverage operations until a determination is made whether Debtor's "lease" with the Hotel owners is a "true lease" or a "financing arrangement,"

---

debtor during such period and (II) the cash proceeds received by the debtor during such

period to which the secured party is entitled under paragraphs (a), (b), and (c).

an issue the parties had agreed not to litigate in this proceeding. While we do not decide the legal status of Debtor's "lease" with the Hotel owners at this time, we reject Sacramento Savings position that we are likewise prevented from deciding the legal status of Debtor's rental income. There is no compelling reason why we cannot decide the legal status of Debtor's rental income from its sublessee.

## ISSUES PRESENTED

1. Whether income from room sales is a personal or real property interest, and whether a security interest is perfected through a recorded assignment of rents, income and profits document or through a UCC security agreement and recorded financing statement?

2. In the event we determine income from room sales is personal property:[14]

   (a) Whether Sacramento Savings or Collin has a valid security interest in the room sales;

   (b) Whether § 552(a) cuts off any lien in Hotel revenue and proceeds as of the date of petition;

   (c) What portion of Debtor's cash, if any, is subject to any Article 9 security interest; and,

   (d) Whether California's UCC § 9306 limits a secured creditor's interest in proceeds for purposes of § 552?

3. Whether income from Debtor's sublessee for the food and beverage operations is rental income? If so, whether Collin, as Well Fargo's assignee, has an "absolute assignment" or mere pledge of security?

## DISCUSSION

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. Rule 56(c); Bankruptcy Rules of Practice and Procedure in Bankruptcy Rule 7056 ("Rule 56 F.R.Civ.P. applies in adver-

sary proceedings."); *Florom v. Elliott Manufacturing*, 867 F.2d 570, 574 (10th Cir.1989) ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *citing*, *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir.1987) ("[a] genuine issue of fact exists only where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *citing*, *Anderson v. Liberty Lobby*, *supra*, 477 U.S. at 248, 106 S.Ct. at 2510 (1986)); *Jones v. Nelson*, 484 F.2d 1165 (10th Cir.1973) (Tenth Circuit emphasized "no margin exists for the disposition of factual issues." *Id.*, at 1168). Conclusory allegations will not establish an issue of fact under Rule 56. *Bruce v. Martin–Marietta Corp.*, 544 F.2d 442, 445 (10th Cir. 1976).

■ All matters in the record and all reasonable inferences therefrom must be construed liberally in favor of the party opposing the motion. *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.1975). *See*, *R–G Denver v. First City Holdings of Colorado, Inc.*, 789 F.2d 1469, 1471 (10th Cir.1986) (appellate court "[m]ust view the record in the light most favorable to the party opposing the motion." *Id.*, *citing*, *Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981)). Finally, a successful Rule 56 movant in the Tenth Circuit must demonstrate entitlement to summary judgment beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir.1978).

The parties agree this proceeding may be summarily disposed of. The majority of the material facts before us are stipulated. Other material facts that were not expressly stipulated are gathered from the parties' undisputed exhibits and unrebutted representations. With the evidence presented in

---

14. The parties request that if we conclude Hotel revenue is real property, we suspend this proceeding and await the outcome of the "lease v. financing arrangement" determination. *See,* page 596 *supra*.

this manner, we deem this to be an appropriate proceeding for summary judgment on the major legal issues presented.[15] All that remains is for us to apply the substantive law and determine as a matter of law which of the movants is entitled to judgment.

1. Hotel Room Sales as Personal or Real Property.

▉ The "real v. personal" property identity of the room sales is a State Law question. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 9 BCD 1259, 19 CBC 481 (1979). California is the applicable State Law because it is the Hotel's situs.

▉ The parties did not cite, and our research confirms the absence of, a single California State Court decision determinative of the real or personal property identity of room sales from quests of a non-residential hotel when used as collateral for a loan. Thus, we turn to persuasive authority to aid our determination.

In *Buena Park Development Corporation v. Builders Investment Group (In re Buena Park Development Corp.)*, CV No. 79–1394 DWW, unpublished Slip Op. (C.D. Cal. Sept. 17, 1979), clarified unpublished Slip Op. (C.D.Cal. Oct. 10, 1979), District Court Judge David W. Williams affirmed the Bankruptcy Court's ruling that hotel room revenues were rent for § 9104(j) purposes.

The debtor in *Buena* operated a Holiday Inn under a lease with an investment group. The investment group filed a "Motion to Sequester Sub–Rents," to preserve for its use money due or to become due the debtor from any sub-lessee, tenant, or occupant of the hotel under an "Assignment of Subrents" clause in its lease with the debtor. Pertinent terms of that clause included: "Tenant hereby irrevocably assigns to Lessor all rents due or to become due from any assignee of Tenant's interest ... and any sublessee or any tenant or occupant of the Property ..." The parties agreed there were approximately $225,000 in re-

ceivables due the debtor on the day it filed bankruptcy, of which 50% were attributable to room sales and 50% to food, beverage, entertainment, and miscellaneous revenues. The debtor took the position that the lease agreement was an assignment of rents due only from the fast food operator or from an automotive parts store and not from the room sales. The Bankruptcy Judge determined the clause was an "absolute assignment" of rents due and included all of the sub-rents from the fast food operator and automotive parts store, and 50% of the room sales. The Bankruptcy Judge also determined that the food and beverage income was not rent and was not exempt from perfection under California's UCC.

The District Court in *Buena* rejected the debtor's attempt to distinguish hotel guests from tenants because:

> Rent is commonly thought of as constituting payment for the temporary use of property (Webster's College Edition—Page 1233). It seems reasonable to give this designation to money paid an innkeeper for use of a room. Clause 21 of this lease deals with a building, the major portion of which is rooms to be let for temporary rental. It is appropriate to conclude that this major source of the lessee's income was intended to be covered by an assignment of rent to the lessor. It should be noted that the clause refers to 'occupants of he property'—not just sub-lessees.

*Buena, supra,* CV No. 79–1394 DWW, unpublished Slip Op. (C.D.Cal. Sept. 17, 1979) at page 3. The District Judge later issued a clarification order to "affirm the conclusion ... that Section 9104(j) would exempt that interest from filing." *Buena, supra,* clarified unpublished Slip Op. (C.D.Cal. Oct. 10, 1979) at page 2.

In *In re Ashkenazy Enterprises, Inc.,* 94 B.R. 645, 18 BCD 1017, 8 UCC.Rep.Ser.2d 183 (Bkrtcy.C.D.Cal.1986), lenders sought to establish operating revenues from three "luxury" hotels as cash collateral. The lenders held promissory notes secured by deeds of trust that gave them a security

---

**15.** As discuss *infra,* certain factual deficiencies   are left to a future hearing.

interest to the "rents, issues, and profits" from the hotels. The issue in *Ashkenazy* was whether the hotels' revenues constituted rent. If the hotels' revenues were rent, then they would be excluded from recording them as secured transactions under California Commercial Code § 9104(j).[16]

The *Ashkenazy* Court held the hotels' revenues were not rent, but rather were proceeds of accounts[17] resulting from payments for goods and services,[18] and, as such, were subject to California's UCC perfection requirements.[19] Despite evidence that room sales were approximately 39% of the total revenues for one of the three hotels, the Court refused to equate room charges to rent and looked to analogous California Legislative distinctions between hotel guests and real estate tenants to support its conclusion:

> The charges for rooms in hotels are generally referred to as rates not rents. Cal.Civ.Code § 1863.[20] A landlord has no lien on his tenant's property for unpaid rent but an innkeeper has a lien for unpaid charges. 3 B. Witkin, *Summary of California Law* § 418 at 2105 (8th Ed.1973).

Cal.Civ.Code §§ 1940–1954.1 deals with the rights and responsibilities of landlords and tenants. Section 1940(a) refers to 'persons who hire' dwelling units as tenants, lessee, boarders, and lodgers among others. Section 1940(b)[21] ex-

---

**16.** Division 9, Cal.Comm.Code § 9104(j), Footnote 10 *supra.*

**17.** Cal.Comm.Code § 9106, *Definitions: 'Accounts;' 'General Intangibles',* provides in pertinent part:

*'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.* 'General intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money.... *Id.,* (emphasis ours).

**18.** The goods and services of the hotels included:

[B]ell service, maid service, linen service, valet parking, security in the parking facilities, 24–hour security guard, message service, mail facilities, safe deposit, check cashing, reservations with affiliated hotels, limousine, newspapers, cable television, stationary and postcards, amenity packages, robes and slippers, wine and fruit baskets, turndown service, guidebooks, multi-lingual staff, room service, restaurant, sundry and gift shop, laundry and dry cleaning, car rental, meeting rooms, equipment rental. *In re Ashkenazy Enterprises, Inc., supra,* 94 B.R. at 647.

**19.** Division 9, Chapter 3, *Rights of Third Parties; Perfected and Unperfected Security Interests; Rules of Priority,* Cal.Comm.Code § 9302, *Requirement of filing to perfect security interest.*

**20.** Division 3, *Obligations,* Part 4, *Obligations Arising from Particular Transactions,* Title 3, *Deposit,* Chapter 2, *Deposit for Keeping,* Article 4, *Innkeepers,* Cal.Civ.Code § 1863, *[Keeper to post rates of charges],* provides in pertinent part:

(a) Every keeper of a hotel, inn, boardinghouse or lodginghouse, shall post in a conspicuous place in the office or public room, and in every bedroom of said hotel, boardinghouse, inn, or lodginghouse, a printed copy of this section, and a statement of *rate* or range or *rates* by the day for lodging. *Id.,* (emphasis ours).

**21.** Division 3, *Obligations,* Part 4, *Obligations Arising from Particular Transactions,* Title 5, *Hiring,* Chapter 2, *Hiring of Real Property,* § 1940 *Application of chapter; 'persons who hire,' defined,* provides in pertinent parts:

(a) *Except as provided in subdivision* (b), this chapter shall apply to all persons who hire dwelling units located within this state including tenants, lessees, boarders, lodgers, and others, however denominated.

(b) *The term 'persons who hire' shall not include* a person who maintains either of the following:

(1) Transient *occupancy in a hotel,* motel, residence club, or other facility when such occupancy is or would be subject to tax under Section 7280 of the Revenue and Taxation Code.

(2) *Occupancy at a hotel or motel where the innkeeper retains the right of access to and control of the dwelling unit and the hotel or motel provides or offers* all of the following *services* to all of the residents:

(A) Facilities for the *safeguarding of personal property* pursuant to Section 1860.

(B) Central *telephone* service subject to tariffs covering the same filed with the California Public Utilities Commission.

(C) Central *dining, maid, mail, room and recreational services.*

(D) *Occupancy for periods of less than seven days.*

(c) 'Dwelling unit' means a structure or the part of a structure that is used as a home, residence, or sleeping place by one person who maintains a household or by two or more persons who maintain a common household. *Id.,* (emphasis ours).

cludes from 'persons who hire' persons as transient occupants of a hotel or motel.[22]

Moreover, a tenant receives an estate in land. Whereas, a hotel guest has a bare right to use. The guest is a mere licensee. The legislature did not give the rights of a tenant to the hotel quest as it did to a boarder or lodger in § 1940.

*Ashkenazy, supra,* 94 B.R. at 647. (Footnotes ours).

Bankruptcy Judge Howard C, Buschman, III, in *Kearney Hotel Partners v. Richardson (In re Kearney Hotel Partners),* 92 B.R. 95 (Bkrtcy.S.D.N.Y.1988) found the *Buena* Court's analysis to be unsatisfactory:

In contrast to these cases [holding hotel room revenues are subject to UCC perfection requirements] is *In re Buena Park Development Corp.,* CV No. 79–1394 DWW, slip op. (C.D.Cal. Sept. 17, 1979) clarified slip op. (C.D.Cal. Oct. 10, 1979), upon which KCCI relies. In holding that hotel room revenues are rents within § 9–104(j) the court stated that there is no distinction between a hotel guest as a 'licensee' and a 'tenant,' CV No. 79–1394 at 241, and citing Webster's Collegiate Dictionary, defined rent as 'commonly thought of as constituting payment for the temporary use of property.' *Id.* (quoting from Webster's Colleg. (sic) Dictionary p. 1233).

This analysis is unsatisfactory. It does not account for the difference between a guest and tenant. Nor does it apply the language of § 9–104(j) which speaks of rents arising from leases.

*Kearney Hotel Partners v. Richardson (In re Kearney Hotel Partners), supra,* 92 B.R. at 102 (Bkrtcy.S.D.N.Y.1988), *appeal dismissed,* Sprizzo, D.J. (S.D.N.Y.1989) (footnote omitted; brackets supplied). After a brief analysis of Nebraska law, *Kearney Hotel* joined with the majority of Courts to hold a security interest in hotel room revenues in Nebraska is personal property governed by Nebraska's UCC perfection requirements.

In *United States v. PS Hotel Corp.,* 404 F.Supp. 1188 (E.D.Mo.1975), *aff'd per curiam,* 527 F.2d 500 (8th Cir.1975), two creditors claimed priority to accounts receivable collected from the hotel. One creditor asserted it had a prior lien on the accounts receivable based on a prior lease amendment which purported to assign to it the "rents, issues, income and profits." *Id.,* 404 F.Supp. at 1192. The other creditor had an Article 9 financing statement covering accounts receivable for loans that postdated the assignment of rents. The *PS Hotel Corp.* Court held for the Article 9 creditor on the grounds that the first creditor was not excused from compliance with Missouri's Article 9.

[D]efendants contend … it was not necessary to comply with the Secured Transactions Article. Section [9–104] excludes from the Secured Transactions Article various listed transactions, one of which is the 'creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder.'

Defendants have cited us to no case which construes this section, particularly as applied to a pledge of accounts receivable of a motel or hotel business to secure payments due under a lease. In our judgment, the statutory exclusion was not intended to apply to such accounts receivable, and the language of the statute cannot reasonably be construed to include them. This case does not involve an instrument conveying an interest in or lien on real estate. And as concerns the words 'rents thereunder,' what is referred to are the rents payable to the lessor under the provisions of a lease, not charges made by the lessee for services it provides to its patrons, even though those services include furnishing rooms in the leased premises for the use of its guests. Hence, the mere fact that the lease and lease amendment were recorded as instruments affecting real estate does not affect the priority of [Arti-

---

**22.** See, Uniform Residential Landlord and Tenant Act § 1.202(4), does not apply to transient occupancy in a hotel or motel [or lodgings [subject to a state transient lodgings or room occupancy excise tax]]. Uniform Act § 1.202(4).

cle 9 creditor's] interest in the accounts receivable.

*Id.*, 404 F.Supp. at 1192 (brackets supplied). *Accord, Investment Hotel Properties, Ltd. v. New West Federal Savings and Loan Association (In re Investment Hotel Properties, Ltd.)*, 109 B.R. 990, 993–94 (Bkrtcy. D.Colo.1990) (hotel room revenue under Missouri law is an account receivable and therefore not excluded from the UCC by 9–104(j)); *Victor Savings and Loan Association v. Grimm (In re Greater Atlantic and Pacific Investment Group, Inc.)*, 88 B.R. 356, 359 (Bkrtcy.N.D.Okl.1988) (same result under Missouri Law).

Sacramento Savings questioned *Kearney's* interpretation of Nebraska law in light of Nebraska's Supreme Court decision in *Metropolitan Life Insurance Co. v. Reeves–Gustafson*, 228 Neb. 233, 422 N.W.2d 72, 6 UCC Rep.Serv.2d 1309 (1988), *amended* (Neb.1989). Sacramento Savings claims the Nebraska Supreme Court expressly rejected the reasoning of *PS Hotel Corp., supra*. *Reeves–Gustafson* did not expressly reject *PS Hotel Corp.*, rather, *Reeves–Gustafson* quoted *Citizens Bank v. Wy-Tex Livestock Co.*, 611 S.W.2d 168 (Tex.Civ.App.1981) where the Texas Court did not find *PS Hotel Corp.* to be persuasive on the issue of whether its version of the UCC should not apply to an assignment of rents from a lease of a livestock feedlot. *Reeves–Gustafson* held Article 9 excludes from coverage the creation or transfer of real estate interests, including a lease or rents thereunder, and because debtor's only right to crops planted and harvested by lessee was as rent due under the lease, an assignment of rents clause in the mortgages was valid and mortgage holder was authorized to collect the proceeds of the crop as rent. *Compare, In re Tavern Motor Inn, Inc.*, 80 B.R. 659 (D.Vt. 1987) (assignment of lease as collateral is real property).

After an exhaustive examination of persuasive Colorado State Law and Federal Decisions throughout the country, Senior District Judge Kane in *Super 8 Motels, Inc. v. M. Vickers, Ltd. (In re M. Vickers, Ltd.)*, 111 B.R. 332 (D.Colo.1990), reversed the Bankruptcy Court and sided with the majority of courts to conclude profits from debtor's motel were personalty rather than rents from real property:

> The more practical approach is a bright-line rule. The only cases which have directly considered this issue have concluded that motel profits are personalty, and may be secured by an Article 9 financing statement.

*Id.*, 111 B.R. at 337. The *Vickers'* Court concluded a UCC perfected security interest in accounts receivable and contract rights took priority over an assignment of rents recorded in the land records.

The *Vickers'* Court distinguished *inter alia, Chaussee v. Morning Star Ranch Resorts Co. (In re Morning Star Ranch Resorts)*, 64 B.R. 818 (Bkrtcy.D.Colo.1986) relied upon by Sacramento Savings.

> In *Morning Star Ranch*, a lender with a deed of trust on the debtor's motel property (which included an assignment of rents clause) moved for a temporary restraining order to prevent the debtor from using the profits generated by the motel. The bankruptcy court in *Morning Star Ranch* reviewed applicable bankruptcy and Colorado law regarding the perfection of an assignment of rents post-bankruptcy. The court concluded that the creditor's filing of a § 546(b) notice to claim an interest in rents and profits was the equivalent of a motion for an appointment of a receiver, that the creditor had therefore perfected his interest in such rents, and that the creditor was entitled to a temporary restraining order limiting the debtor's use of cash collateral. *Id.* at 820–22. It is clear that the *Morning Star Ranch* court simply assumed that the profits generated by the hotel were subject to the assignment of rents, without considering whether they were an interests in real or personal property. *Morning Star Ranch* is therefore of limited assistance in answering this question.

*Vickers, supra*, 111 B.R. at 334–35. Like *Ashkenazy*, *Vickers* cited with approval the result attained in *United States v. PS Hotel Corp., supra*.

We agree with *Kearney* that *Buena* Court's analysis is woefully incomplete. We choose instead to follow the sound analysis of the majority as exemplified by *Ashkenazy, PS Hotel Corp., Vickers, Investment Hotel Properties,* and *Victor Savings,* and hold the Hotel room revenue is not rent from a lease. .

Our conclusion is supported by the distinction between hotel guests and tenants under civil property law.

*'Tenant' distinguished from 'boarder,' 'lodger,' or 'guest.'* While it has been observed that the distinction between a tenant on the one hand and a guest, boarder, or lodger on the other is substantial, well settled, and fully recognized by the authorities, it has also been pointed out that in some classes of establishments the tendency of these different classes of occupants is to shade into each other, and that attention must therefore be given to the detailed criteria that must be relied on to decide into which class given individuals fall. A principal distinction between the relationship of landlord and tenant and that existing between innkeeper and guest, or between a keeper of a boardinghouse or lodginghouse and the boarder or lodger, exists in the fact that the tenant acquires an interest in the real estate, while the guest, boarder, or lodger does not; a guest is a mere licensee and not a tenant. Another distinction rests in the character of the possession, the tenant having the exclusive legal possession, whereas the lodger has merely the use without the actual or exclusive legal possession....

43A C.J.S., *Inns, Hotels, Etc.,* § 5, pages 793–795 (1978). *Accord,* 49 Am.Jur.2d, *Landlord and Tenant,* § 6, pages 47–48.

The term "rent" is universally treated as compensation or income the landowner receives from a tenant for the use, possession, occupation, and enjoyment of the land through a lease. *See e.g., Petroleum Collections Incorporated v. Swords,* 48 Cal. App.3d 841, 122 Cal.Rptr. 114 (1975) ("The foundation for the tenant's obligation to pay rent is his right to use and possess the leased property for the purposes contem-plated by the tenancy; rent is the compensation paid by the tenant in consideration for the use, possession and enjoyment of the premises."); *Mayoral v. Jeffco American Baptist Residences, Inc.,* 726 F.2d 1361, 1364 (10th Cir.1984) ("Meal charges [for elderly tenants of housing project] do not fall within the commonly understood concept of rent. Rent is income that an owner receives from a tenant for the use or occupation of land."); *Peterson v. Oklahoma City Housing Authority,* 545 F.2d 1270, 1274 (10th Cir.1976) ("Rent is a compensation or income which the owner receives from a tenant for the use or occupation of the land.").

Of course the facts may elevate the status of a normal hotel guest from a licensee to a tenant.

In determining the relation between the parties in a given case, the result does not depend on any one factor as being decisive, but rather on the direction which the general effect of the various tests that have been applied.... The relation established depends, in the final analysis, on the contract of hiring, gathered from its terms and interpreted in the light of the surrounding circumstances, having in view the ascertainment of the intention of the parties to the contract. Resort may be had to all the extrinsic facts and circumstances that have a bearing on the character of the occupancy which the parties intended to and did create; and whether the premises are hired by the week or month, are furnished or unfurnished, whether the owner of the house resides on the premises....

The mere fact that a building is operated, advertised, and known as a 'hotel' is not conclusive of the character of any particular occupancy therein, and a person who occupies rooms in a 'hotel' may, under certain circumstances of the case, be a tenant and not a guest; but the appellation used to designate the establishment is to be considered in connection with all the other facts and circumstances to negative or support the existence of any particular character of occupancy.

43A C.J.S., *Inns, Hotels, Etc.,* § 5, pages 796–797 (1978).

The relationship of a landlord and tenant is distinct from that of a licensor and licensee.

> [T]he transmission of an estate to the tenant is an essential characteristic of the relation of landlord and tenant, while no estate in the land passes to a licensee ... and this is the principal characteristic distinguishing the relation. In other words, the principal test for determining whether the relation created is that of landlord and tenant rather than that of licensor and licensee is whether the contract confers exclusive possession of the premises as against all the world, including the owner, and a mere permission to use land, dominion over it remaining in the owner and no interest in, or exclusive possession of, it being given, is but a license.

51C C.J.S., *Landlord & Tenant,* § 6(1), page 38 (1968). *See, Roberts v. Casey,* 93 P.2d 654, 659, 36 Cal.App.2d Supp. 767 (1939) (follows general rule that lodgers, boarders and hotel guests are mere licensees and not tenants); *Buck v. Del City Apartments, Inc.,* 431 P.2d 360 (Okla.1967) (recognized the general rule that the chief distinction between innkeeper's guest and tenant "[L]ies in the element of possession. A tenant is deemed to have exclusive legal possession of the demised premises. A guest ... has merely a right to the use of the premises...." *Id.,* 431 P.2d at 363).

■ In the matter *sub judice,* the burden falls on Sacramento Savings to prove facts to establish the legal relationship between Debtor and its Hotel guests was other than that of licensor and licensee. No such facts were offered or even intimated by Sacramento Savings.

■ In addition to liens and mortgages on real estate, leases of real estate and rents therefrom are excluded from the scope of the UCC's Article 9. Cal.Comm. Code § 9104(j). *See, Drummond v. Farm Credit Bank of Spokane (In re Kurth Ranch),* 110 B.R. 501, 504–505 (Bkrtcy. D.MT 1990) (leasehold interests and rents received therefrom are not subject to Mon-

tana's UCC). Because we hold hotel room revenue is not "rent" from a "lease," but rather income from a mere licensee, we conclude nonresidential hotel room revenue from transient guests is personal property. Thus, the perfection of a security interest in hotel room revenues is governed by Article 9 of California's UCC.

Wells Fargo has a perfected Article 9 security interest. Thus, Collin, Wells Fargo's assignee, is entitled to summary judgment for its priority to the Hotel room revenue.

**2. Section 552's Effect on Collin's Security Interest.**

■ We turn now to the issue of what happens to Collin's security interest on Bankruptcy day. 11 U.S.C. § 552(a) cuts off the secured creditor's perfected pre-petition lien from reaching property acquired post-petition by Debtor or his estate.

An exception to § 552(a)'s cut-off occurs if, under the terms of the security agreement, a secured creditor's pre-petition lien extends to proceeds. Section 552(b) then permits the secured creditor's pre-petition security interest to extend to post-petition proceeds to the extent allowable under the security agreement and applicable nonbankruptcy law.

Collin's security interest meets the first element for § 552(b) because it extends to proceeds. (Stipulation Exhibit #8, at pages 10–11; Stipulation Exhibit #11).

The second element of § 552(b) requires an examination of "applicable nonbankruptcy law." Two key facts narrow our search for the "applicable nonbankruptcy law;" namely, Debtor commingled Hotel room receipts with other funds in its deposit account; and, Debtor incurred at least some operating expenses directly attributable to the room sales.

Under California's § 9306(4)(d), the perfected secured creditor's interest is subject to a debtor's right of setoff and is further limited to the cash proceeds received by the debtor within a 10-day pre-petition window,

less payments made by the debtor. Section 9306(4)(d)(ii)(I).[23]

■ Debtor advocates an application of the tracing doctrine to the proceeds of Debtor's pre-petition accounts receivable that were commingled by Debtor with non-cash collateral in various deposit accounts, and argues Collin's lien is lost to the extent the proceeds can not be traced. We reject Debtor's tracing argument as without merit.

The Uniform Commercial Code Comment applicable to § 9306(4) provides:

This section [§ 9306(4)] provides new rules for insolvency proceedings. Paragraphs 4(a) through (c) substitute specific rules of identification for general principles of tracing. Paragraph 4(d) limits the security interest in proceeds not within these rules to an amount of the debtor's cash and deposit accounts not greater than cash proceeds received within ten days of insolvency proceedings less the cash proceeds during this period already paid over and less the amounts for which the security interest is recognized under paragraphs 4(a) through (c).

The purpose of § 9306(4)(d) is to give the perfected secured creditor an identifiable security interest in lieu of and in replacement of traditional common law tracing rights when confronted by a debtor's insolvency proceeding. *Maxl Sales Co. v. Critiques, Inc.*, 796 F.2d 1293, 1300 (10th Cir. 1986); *Quinn v. Montrose State Bank (In re Intermountain Porta Storage, Inc.)*, 74 B.R. 1011, 1014 (D.Colo.1987); *First National Bank of Amarillo v. Martin*, 48 B.R. 317, 320 (D.N.D.Tex.1985).

In *Hugo v. United States (In re Hugo)*, 58 B.R. 903 (Bkrtcy.E.D.Mich.1986), the Court concluded Michigan's version of § 9–306(4)(d) limited the proceeds lien upon the filing of bankrupt's bankruptcy to cash proceeds "received" by the debtor within ten days of the date of bankruptcy.

While the purpose of § 9–306(4)(d) was to give secured creditors a quantifiable security interest, as measured by § 9–306(4)(d)(ii), in lieu of the traditional common law tracing rights ... we can find nothing in the Official Comments to the Uniform Commercial Code or in various other commentaries which suggests that this provision was intended to apply to post-petition commingling. We find that silence significant. Our conclusion is that § 9–306(4) governs the extent of a creditor's interest in commingled proceeds only up to and including the instant of the commencement of insolvency proceedings. Like many issues in bankruptcy law, property rights under § 9–306 are determined at the inception of the insolvency proceedings. Subsequent events in the insolvency proceedings do not affect these vested rights. *Hugo, supra*, 58 B.R. at 907.

■ In so far as we are dealing solely with commingled cash and deposit accounts under § 9306(4)(d)(ii),[24] we agree with *Hugo* that the debtor must receive the cash proceeds within 10 days of the bankruptcy filing.

Section 552(b)'s "equities" exception permits the Bankruptcy Court to override § 552(b)'s exception to § 552(a)'s prohibition of the continuation of a pre-petition lien to post-petition proceeds. Before a Court may invoke § 552(b)'s "equities" exception to override the limitations of applicable nonbankruptcy law and security agreements, there must be a factual finding that the modification of such limitations is warranted. No such facts were offered to support a § 552(b) "equities" finding. We conclude, therefore, Collin is not excused from the limitation of its security agreement and applicable nonbankruptcy law under § 552(b).

Thus, Collin's perfected security interest extends to all cash and deposit accounts into which the proceeds from the room sales were commingled within 10 days of

---

**23.** *See,* footnote 13 *supra.*

**24.** Although not pertinent to the proceeding *sub judice,* the perfected secured creditor is entitled *inter alia* to identifiable noncommingled sums or undeposited checks under §§ 9306(4)(a), (b), and (c), in addition to sums due under § 9306(4)(d)(ii)(I). Section 9306(4)(d)(ii)(II).

Debtor's date of petition, less Debtor's set-off operating expenses. For purposes of Debtor's set-off under § 9306(4)(d)(i), we are not informed of the amount of Debtor's operating expenses that were directly attributable to Hotel room sales. This figure must be backed out of the amount due Collins. We leave this factual gap for a future hearing.

### 3. Food and Beverages Rentals.

██ There is no doubt that the income from the food and beverage operations by Sacramento Operating, Inc., Debtor's sublessee, is rent.

██ Collin filed in Debtor's Chapter 11 case a "Notice of Perfection of Interest in Rents" under 11 U.S.C. § 546(b). No post-petition § 546(b) notice was required by Collin. Collin's post-petition filing was an unnecessary exercise of caution because Debtor and the Hotel property owners executed the Wells Fargo Deed of Trust (Stipulation Exhibit # 8), where they "absolutely assign[ed] and transfer[ed]" rents to Wells Fargo as "additional consideration for the indebtedness." (Stipulation Exhibit # 8, at page 9).

Collin has an "absolute assignment" of rents which was perfected pre-petition. Under California law, an "absolute assignment" operates to transfer to the mortgagee the mortgagor's right to the rentals upon the happening of the specified condition. *Kinnison v. Guaranty Liquidating Corporation*, 18 Cal.2d 256, 261, 115 P.2d 450 (1941).

██ An "absolute assignment" is distinguishable from a mere pledge for additional security. Where a deed of trust contains a clause that merely includes rents as a portion of the property pledged to secure a debt, only a security interest passes. Until a beneficiary obtains possession or does some other act to claim perfection, the trustor in possession may collect and retain the rents as they fall due. *Malsman v. Brandler*, 230 Cal.App.2d 922, 41 Cal. Rptr. 438 (1964). After the filing of bankruptcy, the creditor must file a § 546(b) post-petition notice to obtain the pledged rents or its substitute. *See, Santa Fe Fed-eral Savings & Loan Association v. Oak Glen R–Vee (In re Oak Glen R–Vee)*, 8 B.R. 213, 215 (Bkrtcy.C.D.1981) (under California law, where assignment of rent is given as additional security rather than an absolute assignment, than creditor must take possession, appoint a receiver, or take such other action in substitution for possession to obtain the rents); *Casbeer v. State Federal Savings & Loan Association of Lubbock (In re Casbeer)*, 793 F.2d 1436 (5th Cir.1986) (Texas law required possession or other similar action before the assignment would be effective where assignment of rent in a pledge to secure a debt was not an absolute assignment. Creditor's filing post-petition motion perfected its interest and entitled it to replacement liens for rentals that accrued after perfection).

Collin is entitled to priority on its perfected security interest in the rental income from Debtor's sublessee for the food and beverage operations. There is no evidence, however, that its sublessee paid any of the rental monies due under the "Sublease." The sales figures set forth in the parties' stipulation do not take into account the costs associated with the sales. Although we calculated an approximate amount due from Sacramento Operating, Inc., (footnote 6 *supra*), we do not know the amount for miscellaneous charges, or whether this rent has been paid. Until net figures are available, it is not possible to quantify the lien. The exact amount due from Sacramento Operating, Inc., and Debtor's and Collin's respective shares remains for a future hearing.

### CONCLUSION

██ Based on the evidence presented, we hold revenue from Hotel room sales is personal property, rather than rent from real property, and is subject to the perfection and priority requirements under Article 9 of California's Uniform Commercial Code (UCC). We also hold Hotel revenue from telephone services, convention services, meeting and banquet facilities, commis-

sions, interest income, cash accounts earned, no-show revenue, guest laundry, valet, and in-room movies is personal property subject to the perfection and priority requirements under Article 9 of California's UCC. Accordingly, we hold Collin, Wells Fargo's assignee, is entitled to summary judgment for priority on the Hotel revenue to the extent allowable under 11 U.S.C. 552(b) and Cal.Comm.Code § 9306(4)(d).

Sacramento Operating, Inc. is Debtor's sublessee in charge of the Hotel's food and beverage sales. The food and beverage revenue is rental income under the terms of Debtor's sublease because Debtor executed an "absolute" assignment of rent to Wells Fargo that was properly perfected by Wells Fargo under California's real property law. Wells Fargo, in turn, properly assigned the assignment of rents to Collin. No § 546(b) notice was needed from Collin to protect its perfected interest in the "absolute assignment" of rents. Accordingly, we also hold Collin is entitled to summary judgment on its request for priority on sums due Debtor from Sacramento Operating, Inc.

The following factual matter is left for a future determination: 1). Facts from Debtor to establish entitlement to set-off under § 9306(4)(d)(i) to adjust the final amount due Collin; and, 2. Net sales for Debtor's rental income from its food and beverage sublessee.

Counsel for Collins is directed to submit an appropriate Order for entry, on notice, within 15 days.